

# Chase Business Banking 8A

## Schedule A Pricing Sheet

IPT - Version Date 07/2017

---

**1.   Fees applied on every transaction:** MasterCard, Visa and Discover assess an Interchange Rate, Interchange Fee, Assessment Fee and Network Fee for each transaction.  American Express assesses a Wholesale Discount Rate and Network Fee for each transaction.  These rates and fees will be passed through at cost.

### Payment Brand Interchange

| | |
|---|---|
| Interchange and Wholesale Discount Rates | |
| PIN Debit Network Fees (if accepted) | |
| JCB (Japanese Credit Bureau) (if accepted) | |

### Payment Brand Assessments

| MasterCard | Credit transactions less than $1000 and all Debit transactions | |
| | Credit transactions greater than $1000 | |
| Visa | Debit transactions | |
| | Credit transactions | |
| American Express OptBlue Network Fee | | |
| Discover / JCB | | |

| Payment Brand Network Fees | Credit | Debit |
|---|---|---|
| MasterCard Network Access & Brand Usage Fee (NABU) (Charged per Authorization & per Refund) | | |
| Visa Processing Fee (APF) (Charged per Authorization & per Refund) | | |
| Discover / JCB Data Usage Fee | | |

### Authorization / Transaction Fees

| | |
|---|---|
| MasterCard / Visa / American Express / Discover Discount Rate | |
| MasterCard / Visa / American Express / Discover per authorization | |

| | |
|---|---|
| PIN Debit Discount Rate | |
| PIN Debit per transaction | |

---

**2.   One Time and Periodic Fees**

### One Time Fees [1]

| | |
|---|---|
| Account Setup Fee | |
| Terminal Reprogram Fee | |

### Monthly Fees [2]

| | |
|---|---|
| Monthly Service Fee | |
| Visa Fixed Acquirer Network Fee [3] | |
| Monthly Minimum Fee [5] | |

### Annual Fees

| | |
|---|---|
| Annual Fee | |
| MC Merchant Location Fee [4] | |

1 – Please be sure you have enough funds in your bank account to have these fees electronically debited.  These fees will be electronically debited from your bank account at the time of setup.

2 – Monthly service and minimum fees will be debited for the first time in the month after your account has been set up.  These fees will be debited regardless of whether you are processing transactions through your account.

3 – Visa Fixed Acquirer Network Fee is a monthly fee assessed by Visa based on Merchant Category Code (MCC), dollar volume, number of merchant locations, number of Tax IDs, and whether the physical Visa card is present or not present at the time of the transaction.  This fee can vary monthly.

4 – MC Merchant Location Fee of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  The fee will be assessed annually in May based on the previous 12 months activity.

5 – We will apply the Monthly Minimum Fee only when the total amount of all processing fees (Sections 1, 3A, & 4) is ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮.

| Customer initials | x  | By initialing this page, the undersigned Authorized Representative hereby certifies, for itself and for and on behalf of the Merchant, that the fees, rates and other charges set forth on this page have been reviewed, accepted and constitute a part of this Schedule A. *(Please initial here for page 1 and sign Section 6 on page 3)* |
|---|---|---|

## 3.  Per Incidence Fees

### 3A.  Per Incidence Fees: Charged every time your account incurs one of the below items

| | | |
|---|---|---|
| Chargeback Fee | | Charged when a cardholder or card-issuing bank formally protests a charge |
| Voice Authorization Fee | | Charged when you call the Voice Authorization phone number to authorize a credit card |
| Batch Settlement Fee | | Charged for each batch of transaction(s) submitted for settlement |
| ACH Return Fee | | Charged when Chase is unable to debit fees from your account |

### 3B.  Per Request Fees: Charged every time you request one of the below items

| | | |
|---|---|---|
| Statement Fee (Email/ROL) | | No charge if statements are sent to a valid email address or accessed by Merchant through Resource Online, as elected by Merchant on the Application. |
| Statement Fee (Mail) | | Charged each month Chase mails a statement (whether at the request of Merchant or because delivery to a valid email address has failed) |
| Supplies | | Charges for supply orders vary based on the items ordered |
| Equipment Swap Fee | | Charged when you swap equipment with Chase.  Fees for swapping equipment vary based on the equipment manufacturer and model. |

## 4.  Payment Brand Fees – Per Incidence

### These fees are billed by MasterCard, Visa, American Express and Discover and passed through to your account

| | | |
|---|---|---|
| MC Acquiring License Fee * | | Charged on MasterCard Gross Sales volume. See additional information under Payment Brand Charges in Section 5. |
| MC Digital Enablement / Card Not Present Fee | | Charged on MasterCard Card Not Present Gross Sales volume. |
| AX OptBlue Card Not Present Fee | | Charged on American Express Card Not Present Gross Sales volume. |
| AX OptBlue Application-initiated Fee | | Charged on American Express transactions initiated by a digital wallet application. |
| Discover / JCB Network Authorization Fee | | Charged by Discover on all authorizations for card transactions that are settled through the Discover Network |
| MC Auth Access Fee – AVS Card Present | | Charged by MasterCard when a merchant uses the Address Verification Service to validate a cardholder address |
| MC Auth Access Fee – AVS Card Not Present | | |
| MC Auth Access Fee | | Charged by MasterCard when an authorization is reversed or the authorization is provided by MasterCard if the card Issuer is not available. |
| MC Card Validation Code 2 Fee | | Charged by MasterCard when a merchant submits the Card Validation Code 2 (CVC2) in an authorization request |
| MC SecureCode Transaction Fee | | Charged on MasterCard SecureCode transactions that are sent for verification. |
| MC Account Status Fee (Intra-regional) | | Charged by MasterCard or Visa when a merchant uses this service to do an inquiry that a card number is valid |
| MC Account Status Fee (Inter-regional) | | |
| Visa Zero $ Account Verification Fee | | |
| MC Processing Integrity Fee | | Charged when a card is authorized but not deposited and the authorization is not reversed in a timely manner. |
|    Pre authorization | | |
|    Final authorization * | | * |
| Visa Misuse of Authorization Fee | | |
| Visa Zero Floor Limit Fee | | Charged when a transaction is deposited but never authorized |
| Visa Transaction Integrity Fee | | Applies to Visa Debit & Prepaid transactions that do not meet qualification criteria for Custom Payment Service (CPS) categories |
| MC Ineligible Chargeback Blocking Fee | | Charged when a fraud related Chargeback is blocked by MasterCard. |
| MC Cross Border Assessment Fee | | |
| Visa International Service Assessment Fee | | Charged by MasterCard, Visa, American Express and Discover on foreign bank issued cards |
| American Express OptBlue International Fee | | |
| Discover / JCB International Service Fee | | |
| MC International Support Fee | | Additional fee charged by MasterCard, Visa and Discover on foreign bank issued cards |
| Visa Interregional Acquiring Fee | | |
| Discover / JCB International Processing Fee | | |

| | | |
|---|---|---|
| **Customer initials** | x  | By initialing this page, the undersigned Authorized Representative hereby certifies, for itself and for and on behalf of the Merchant, that the fees, rates and other charges set forth on this page have been reviewed, accepted and constitute a part of this Schedule A. *(Please initial here for page 2 and sign Section 6 on page 3)* |

**IPT - Version Date 07/2017**

Exhibit 1

## 5.  Payment Brand Charges & Termination Fees

**Payment Brand Charges**
Part of the fees that we charge you for processing your transactions consist of fees we pay to the Payment Brands.

These charges, called "Payment Brand Charges", include, but are not limited to, interchange rates, assessments, file transmission fees, access fees, and international and cross border fees. Therefore, in addition to the rates set forth above, you also will be charged Payment Brand Charges. Payment Brand interchange rates can be accessed online by visiting the Learning & Resources section of Chase Merchant Service's website, and selecting "Understanding Interchange".

Please note that Paymentech, LLC ("Chase") may, from time to time, elect not to charge you for certain existing, new or increased Payment Brand Charges.  If we elect not to charge you, we still reserve the right to begin charging you for existing, new or increased Payment Brand Charges at any time in the future, upon notice to you.  No such Payment Brand Charges will be imposed retroactively.



**Amount due upon Termination**
Chase does not charge a fee for closing your merchant account; however, we may request that you reimburse us for the value of any promotional consideration provided to you, as further outlined in Section 10.2 of the Agreement.

NOTICE REQUIRED BY AMERICAN EXPRESS: American Express requires that Chase inform you that (i) American Express charges Chase a wholesale discount rate and not interchange and (ii) American Express operates a non-interchange based network.

## 6.  Legal Name & Authorized Signature

Legal Name must be the same as on the Merchant Application Section 1 (Legal Information)

MNG 2005 inc

**Legal Name of Business**

Authorized Representative Signature: Must appear on Merchant Application Section 10

X _DocuSigned by:_ [signature] 

~~——————————~~
**Signature** D466A94E7...

David Palatnik

**Print Name**

3/30/2018

**Date**

By signing above, the Authorized Representative hereby certifies, for itself and for and on behalf of the Merchant, that the fees, rates and other charges set forth on each page of this Schedule A have been reviewed, accepted and constitute a part of this Schedule A.

**Please ensure you have initialed Page 1 & 2**

# Publicly/Privately Held Addendum

**CHASE**
**J.P.Morgan**

This Addendum supplements the Merchant Application And Agreement executed and submitted by
<u>MNG 2005 inc</u>                                    (Merchant Legal Name - "Merchant").  As such, this
Addendum shall (i) be deemed incorporated into and a part of Merchant's Application to establish a Merchant
account with Paymentech, LLC and JPMorgan Chase Bank, N.A. and (ii) in accordance with such Merchant
Application and Agreement, constitute a part of the entire Agreement governing all Merchant accounts.

## CUSTOMER INFORMATION (how you do business)

**Do you have locations, sell goods or services, or have vendors or suppliers in countries sanctioned by the U.S.? (Cuba, Iran, North Korea, Sudan, Syria, Crimea Region)**

☐ Yes  (list countries)   ☒ No

---

**Do you have any significant business operations (>10% of operations) outside of the U.S.?**

☐ Yes  (list countries)   ☒ No

---

**Types of customers? (select all that apply)**

☐ Individuals                  ☒ Small Businesses          ☐ Charitable Organization or Foundations
☐ Medium/Large Corporations    ☐ Retail Businesses         ☐ Government Entities

**Do you have any major customers (>10% of sales) outside of the U.S.?**

☐ Yes  (list countries)   ☒ No

---

**Types of Suppliers and/or Vendors? (select all that apply) Note: If you are a service provider select "Other"**

☒ Retailers          ☐ Wholesalers          ☐ Manufacturers          ☐ Import Services
☐ Other (explain)

**Do you have any major suppliers or vendors (>10% of merchandise) outside of the U.S.?**

☐ Yes  (list countries)   ☒ No

## TOTAL ANNUAL REVENUE

**The total amount of your company's annual sales (If new business, please insert "projected" revenue) and other sources of income.  (US and foreign combined)**

| Total Annual Revenue  8500000 | Most Recent Fiscal Year Ending  12/31/2017     (MM/DD/YYYY) |
|---|---|

Source of Revenue
☒ Sale of goods  ☐ Sale of services  ☐ Sale of assets  ☐ Legal Settlements  ☐ Grants/Donations
☐ Other (explain)

## TOTAL VALUE OF BUSINESS ASSETS

**The sum of all cash, investments, receivables, etc. owned by the business.  (US and foreign combined)**
**Note: Business Assets must be greater than $0.**

Total Value Of Business Assets   $ 2000000        Value is…  ☐ Actual   or   ☒ Estimate

Total Assets Valued As Of Fiscal Year Ending 12/31/2017        (MM/DD/YYYY)

Select Primary Country Of Assets   ☒ US        ☐ Other Country (name)

## SOURCE OF CAPITAL (supply if your business has been in operation less than 2 yrs…"Business Start Date")

(select all that apply)

☐ SBA Loan      ☐ Local & State Economic Development Loan      ☐ Bank Loan      ☐ Grant

☐ Money From Friends or Family      ☐ Money From Customers or Vendors      ☐ Peer-to-Peer Loans

☐ Internet Based Loan      ☐ Self-Funded      ☐ Angel Investor/Private Equity/Venture Capital      ☐ Factoring Loan

☐ Retirement Funds      ☐ Personal Loan      ☐ Other  If Other, Describe

## Authorized Representative

I, the undersigned, certify:
- that I am an owner, officer or other authorized representative of the Merchant ("Authorized Representative") and
- that I am duly authorized to enter into agreements on behalf of Merchant and to legally bind Merchant to such agreements.
- that I am duly authorized to submit this Addendum and all information contained herein on behalf of the Merchant.

By submitting this Addendum, Merchant, through the undersigned Authorized Representative
- represents and warrants that the person submitting this Addendum is duly authorized to enter into agreements on behalf of Merchant and to legally bind Merchant to such agreements.
- represents and warrants that all information contained within this Addendum is true, complete and not misleading.

Authorized Representative:

**X** _DocuSigned by:_ [signature]
         1DC2E58A466A94E7...
Signature

David Palatnik
Print Name

3/30/2018
Date

**Note: Signer must be listed as an Owner or Authorized Representative on the Merchant Application or the Owner/Officer Addendum**
**(Sales Rep will provide)**

*Rev. PUBLIC/PRIVATE 08/2017*

Exhibit 1

# Merchant Application and Agreement

**CHASE** ◆
**J.P.Morgan**

| THIS SECTION IS FOR INTERNAL USE ONLY | *Rev. NAPSTANDDS 04/2018 DfS* |
|---|---|
| Application ID: 9864320 | Sales Rep: Michael Reed |
| Rep Fax: | Rep Phone: (214) 849-3761 |

**1. Merchant Business** To help prevent the funding of terrorism and money laundering activities, Federal law and JPMC policies require us to obtain, verify, and record information that identifies each person who opens an account. In order to comply with these requirements, we will ask for your business name, physical address, and government identification number in order to verify your identity.

| A | "Doing Business As" (DBA) Information |
|---|---|

**Merchant DBA Name**
CKRT Oils

**Name of Primary Contact**
David Palatnik

**Business Start / Date of**
8/7/2013    MM/DD/YYYY

**Address (No PO Box or Paid Mail Box)**
1380 Ferguson Ave. St.

**City**
St Louis

**State**
MO

**Zip Code**
63133

**Telephone #**
███████████

**Fax #**

**Merchant DBA Email Address**
██████████████████

| B | Legal Information |
|---|---|

**Merchant Legal Name**
MNG 2005 inc

**State of Formation**
MO

**Federal Tax ID/EIN**
██████████████

**Business Type**
Private Corporation

Stock Exchange _____    Ticker Symbol _____
Government Agency – Website URL:

**Primary source of revenue for the legal entity** Cooking oils

If Government Owned or a Non Government Organization what is the primary source of funding?

Does Does your Legal Entity identify as any of the following: Bank, Non-Operating Asset Holding Company, Fund or None of these? None of these

Does the legal entity invest money it receives from investors on a collective basis?

**Legal Information same as DBA?**

**Address (No PO Box or Paid Mail Box)**
1380 ferguson ave. St.

**City**
St Louis

**State**
MO

**Zip Code**
63133

**Telephone #**
███████████

**Fax #**

**Legal Email Address**
███████████████

**Continues on next page**

Exhibit 1

Signer 1 Email    dudi.pal@gmail.com

**Taxpayer Information same as Legal?** Yes

| C | Taxpayer Information (For help, please consult the Instructions for IRS Form W-9, which are available upon request or online at www.irs.gov) |
|---|---|

Taxpayer Name (as shown on Merchant's income tax return)

MNG 2005 inc

Federal Tax ID/EIN (sole prop use SSN)

██████████

Business Name / disregarded entity name, if different from above

CKRT Oils

Exemptions

Exempt payee code (if any): N/A

Federal tax classification

| S Corporation | Limited Liability Company, enter the tax classification: |
|---|---|

Exemption from FATCA reporting code (if any):  N/A

Address

1380 ferguson ave. St.

Requester's name and address:
Paymentech, LLC
8181 Communication Parkway
Plano, Texas 75024

| City | State | Zip Code |
|---|---|---|
| St Louis | MO | 63133 |

## 2. Merchant Profile

Is your business home-based?  No

What merchandise do you sell or services do you provide? Cooking oils

Is your business seasonal?  No

What is your business industry type?   Internet – Lists all websites on which you accept payments and provide a customer service email address:

Internet              ckrtoils.com           ████████████

Do you ever charge a Customer on a recurring basis?  No       If yes, how often will you charge?

Are Customers required to pay a deposit?  No       If yes, what % of total sale?

## 3. Reporting, Statements, Chargeback Requests, and Retrieval Requests

**Reporting and Statements** – you may access transaction history and monthly statements online via Resource Online, or have your monthly statements emailed to you.

**Chargeback and Retrieval Requests**

| Delivery Method | Email Address / Resource Online user login | Mail Chargeback and Retrieval requests to: |
|---|---|---|
| Resource Online | DBA Email | DBA Address |

## 4. Sales Information

What is the estimated annual breakdown (in %) of your annual Payment Card Transactions?

| | |
|---|---|
| 0% | Via mail or phone order |
| 100% | Payments accepted on your website |
| 0% | Card is swiped |
| 0% | Card is present but keyed |
| **100% Total** | |

## 5. Ownership Information

**Please select Ownership Organizational structure (i.e. individual, parent company):** Individual

| A | Individual 1 | B | Individual 2 |
|---|---|---|---|

Name of Individual/Sole Proprietor or Entity/Parent Company

David Palatnik

Name of Individual/Sole Proprietor or Entity/Parent Company

Corporate Title

President

Corporate Title

**Continues on next page**

Exhibit 1

DocuSign Envelope ID: 9AB5A87A-B733-4DBB-999D-FEF32C309B6F

| Date of Birth | SSN | | | Date of Birth | SSN | | |
|---|---|---|---|---|---|---|---|
| ▮▮▮▮▮ | ▮▮▮▮▮▮▮▮▮ | | | | | | |

Street Address (Individual/sole prop use home address) (No PO Box or PMB)

▮▮▮▮▮▮

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| ▮▮▮▮ | ▮▮ | ▮▮▮ | | | |

| Telephone # | % Ownership | Telephone # | % Ownership |
|---|---|---|---|
| ▮▮▮▮ | 100 | | |

| (if Entity) Is Entity publicly traded? | Stock Exchange | Ticker Symbol | (if Entity) Is Entity publicly traded? | Stock Exchange | Ticker Symbol |
|---|---|---|---|---|---|
| No | | | | | |

| Country of Domicile | Country of Domicile |
|---|---|
| USA | |

| * For Non-US Persons: Social Security Number, Passport Number and Country of Issuance or other similar identification number may be substituted.<br><br>For Canadian individuals, this field is optional<br><br>Government Issued ID #:<br><br>Type of ID (ex. Passport):<br><br>Country of Issuance: | * For Non-US Persons: Social Security Number, Passport Number and Country of Issuance or other similar identification number may be substituted.<br><br>For Canadian individuals, this field is optional<br><br>Government Issued ID #:<br><br>Type of ID (ex. Passport):<br><br>Country of Issuance: |
|---|---|

**Controlling Officer – an individual with significant responsibility for managing the legal entity**

Name

David Palatnik

Street Address (Provide residential address. No PO Box or paid mailbox)

▮▮▮▮▮

| City | State | Zip Code |
|---|---|---|
| ▮▮▮ | ▮▮ | ▮▮▮ |

Country

USA

| 1 | ☐ Key Decision Maker i.e. Senior Mgr. | 2 | ☐ Chairman | 3 | ☐ Chief Executive Officer | 4 | ☐ Chief Financial Officer |
|---|---|---|---|---|---|---|---|
| 5 | ☐ Chief Operations Officer | 6 | ☐ President | 7 | ☒ Other (specify) Owner | | |
| | | DOB | ▮▮▮▮ | SSN/EIN* | ▮▮▮▮ OR | ☐ Non-US Person (see below) | |

Selections (1-7) above require a Date of Birth (DOB) and SSN/EIN* (or if you selected "Non-Profit" in section 1B)

| 8 | ☐ Board of Directors (select) | ☐ Voting | ☐ Non-Voting | |
|---|---|---|---|---|

* For Non-US Persons: Social Security Number, Passport Number and Country of Issuance or other similar identification number may be substituted.

For Canadian individuals, this field is optional

Government Issued ID #:          Type of ID (ex. Passport):          Country of Issuance:

**Do you have any additional owners (individuals or entities) not listed above that have 10% or greater ownership, either directly or indirectly?**

☐ Yes Owner/Officer Addendum required (Sales Representative will provide)          ☒ No

Note: If an Entity/Parent Company is listed above in section 5 that has 10% or greater ownership of the applicant, please identify any owners (Individuals and/or Entities) of that Entity/Parent Company that ultimately have 10% or greater ownership in the applicant on the Additional Owner/Officer Addendum (Sales Representative will provide)

**Is there anyone not listed above who has authority to make financial decisions or control company policy on behalf of your business?**

☐ Yes Owner/Officer Addendum required (Sales Representative will provide)          ☒ No

Exhibit 1

| C | Authorized Representative |
|---|---|

**Name**

[                                    ]

**Street Address (Provide residential address. No PO Box or paid mailbox)**

[                                                              ]

**City** [                          ]  **State** [        ]  **Zip Code** [                ]

**Country**

[ USA                               ]

## 6. Funding and Account Information

The Merchant must own the bank account provided below and it shall be used by Merchant solely for business purposes and shall not be used for personal, family or household purposes. In accordance with the terms of the Agreement, Chase Paymentech may:

- deposit into this account amounts owed to Merchant by Chase Paymentech, such as proceeds from Merchant's Payment Card Transactions
- debit this account for amounts Merchant owes to Chase Paymentech associated with its Merchant account, such as fees for processing Merchant's Payment Card Transactions
- debit this account for any negative amounts presented, such as refunds, returns or chargebacks

| Merchant's Bank Account | |
|---|---|
| Name of Financial Institution<br><br>Bank of America | Designating this bank account for the purposes outlined above must not violate any of Merchant's organizational documents or any agreement to which the Merchant is a party. |
| Routing Number (always consists of 9 digits)<br><br>████████ | Account Number (number of digits will vary)<br><br>████████ |

The image below shows where to find your Routing Number and Account Number. Do not use the internal routing number that begins with a 5.



## 7. Payment and Processing Information

If you have previously accepted payment cards, please include your three (3) most recent monthly processing statements.

Please check all payment methods you wish to accept:

☒ Visa     ☒ MasterCard     ☒ Discover/JCB

☐ Voyager     ☐ Wright Express     ☐ PIN Debit

| | |
|---|---|
| Estimated Annual Visa/MasterCard/Discover/American Express* Sales Volume<br><br>*American Express Volume should be included only if electing the OptBlue program in section 9* | $ 100000 |
| Estimated Annual PIN Debit Sales Volume | $ 0 |
| Estimated Average Ticket Amount (all card types) | $ 75 |
| Highest Transaction Amount | $ 750 |

**Continues on next page**

Exhibit 1

## 8. IRS Certification (IRS Form W-9 instructions available upon request)

Under penalty of perjury, I certify that:

1. The number shown on this form (Section 1C) is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest in dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. citizen or other U.S. person (defined in the instructions), and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Do you certify all the above statements to be true?   Yes

## 9. American Express®    Less than 1 Million

**A**

☒  **Accept American Express (OptBlue Program).**   There is no need to contact American Express for an account.

Choose this option if your American Express annual processing volume is less than $1,000,000 and you wish to accept American Express Payment Cards, Section 14 of the Terms and Conditions regarding participation in the American Express OptBlue Program will govern your rights and obligations regarding acceptance of the American Express Payment Cards and the settlement of the related Transactions.  If you do  choose this option, Merchant understands that, by signing below, Merchant agrees to participate in the American Express OptBlue Program, **including consenting to the sharing of Merchant's data with American Express to allow American Express to directly communicate with Merchant  as provided in section 14 of the Terms and Conditions**.

   *Please include your expected annual American Express Volume in the Estimated Annual Sales Volume amounts in section 7.

   **Your eligibility is subject to Merchant Segment approval and Franchise/Association Relationship review

**B**

☐  **Accept American Express** (Corporate, Franchise, or large relationships with American Express)

Choose this option if your American Express processing volume is greater than $1,000,000 (or you are an ineligible Merchant Segment, Franchise or unauthorized to participate in OptBlue as determined by American Express ), and you wish to accept American Express Payment Cards, Section 4.3 of the Terms and Conditions regarding Conveyed Transactions will govern your rights and obligations regarding acceptance of the American Express Payment Cards and the settlement of the related Transactions.

Please enter your American Express SE# here: _____. If you do not have an American Express identification number, please contact American Express directly using the number provided and then advise us once you have obtained the information. (1-855-TAKE-AXP or 1-855-825-3297).

*When selecting this option do not include your American Express Volume in the Estimated Annual Sales Volume amounts in section 7.

**C**

☐  **Accept American Express (Not OptBlue)**

Choose this option if the **Merchant qualifies for, but does not desire to participate in the American Express OptBlue Program or does not consent to the sharing of Merchant's data with American Express to allow American Express to directly communicate with Merchant,** but Merchant does wish to accept American Express Cards, *Section 4.3 of the Terms and Conditions regarding Conveyed Transactions will govern your rights and obligations regarding acceptance of the American Express Payment Cards and the settlement of the related Transactions.*

Please enter your American Express SE# here: _____. If you do not have an American Express identification number, please contact American Express directly using the number provided and then advise us once you have obtained the information. (1-855-TAKE-AXP or 1-855-825-3297).

*When selecting this option do not include your American Express Volume in the Estimated Annual Sales Volume amounts in section 7.

**Continues on next page**

Exhibit 1

## 10. Individual Guarantor(s)

The person(s) acting as individual guarantor(s) must have an ownership interest in Merchant and must be listed in Section 5 of this Application.
As an individual(s) who agrees to be personally responsible for Merchant's account with Chase Paymentech (a "Guarantor"), I

- certify I have received and reviewed a complete copy of the Agreement, including the Application, Terms and Conditions, and Schedule A
- certify I have read the Agreement, including, without limitation, the "Personal Guaranty" section at the end of the Terms and Conditions
- agree to be bound as a Guarantor of the Merchant's obligations under the Agreement in accordance with the "Personal Guaranty" section of the Terms and Conditions
- certify that I have an ownership interest in Merchant

- agree that Chase Paymentech, Member, or their designees, may investigate and verify the credit and financial information about me and may obtain consumer credit reports on me from time to time
- agree that Chase Paymentech, Member, or their designees, may use such consumer credit reports in connection with establishing and maintaining the Merchant's account and Agreement
- agree that all business references, including financial institutions, may share my credit and financial information with Chase Paymentech

Guarantor:

X _____   David Palatnik   4/2/2018
  Signature                   Print Name        Date

Guarantor:

X _____   _____   _____
  Signature                   Print Name        Date

## 11. Authorized Representative(s)

The first five pages of this document are the Merchant's Application to establish a Merchant account with Paymentech, LLC ("Chase Paymentech") and JPMorgan Chase Bank, N.A. ("Member"). Once submitted, the Application belongs to Chase Paymentech and Member. Any application or set up fee paid by Merchant is non-refundable. The Application is subject to approval by Chase Paymentech and Member. If the Application is approved, Chase Paymentech will establish one or more Merchant account(s). All Merchant accounts will be governed by the entire Agreement, which includes: the Application, the Terms and Conditions, Schedule A (pricing), and any amendments, supplements or modifications provided to you.

I, the undersigned, certify:
- that I am an owner, partner, officer or other authorized representative of the Merchant ("Authorized Representative"); and
- that I am duly authorized to enter into agreements on behalf of Merchant and to legally bind Merchant to such agreements.

Furthermore, by signing below as an owner of Merchant, I authorize and instruct Chase Paymentech, Member or their designees to conduct the following in connection with establishing Merchant's account and maintaining the Agreement:
- obtain and use consumer credit reports (or other information derived therefrom) on me from time to time; and
- investigate and verify personal credit and financial information about me or any other owner listed in this Application or the Agreement (including within any amendment, addenda or attachment thereto)

By submitting this Application and Agreement, Merchant, through the undersigned Authorized Representative:
- represents and warrants that the person submitting this Application is duly authorized to enter into agreements on behalf of Merchant and to legally bind Merchant to such agreements;
- represents and warrants that all information contained within the Application as well as any information submitted in conjunction with the Application is true, complete, and not misleading;
- represents and warrants that it owns the bank account provided in Section 6 and the account is being maintained solely for business purposes and not for personal, family or household purposes;
- represents and warrants that it has received a complete copy of the Agreement, including the Terms and Conditions for Merchant Agreement and Schedule A and agrees to be legally bound by the Agreement;
- understands that any unilateral changes to the pre-printed text of any part of the Agreement may result in Chase Paymentech declining Merchant's Application or terminating the Agreement
- agrees that Chase Paymentech, Member, or their designees, may:
  - investigate and verify the credit and financial information of Merchant; and
  - obtain credit reports on Merchant from time to time and use them in connection with establishing Merchant's account and maintaining the Agreement; and
- agrees that Member and Chase Paymentech may share credit, financial information about Merchant and Chase Paymentech.
- agrees, if accepting American Express Payments Cards, to comply with the applicable provisions of the Terms and Conditions regarding acceptance of American Express Payment Cards as outlined in Section 9 above.

The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding. (See Section 8 above).

Owner / Authorized Representative: Signer's name must appear in Section 5

X _____   David Palatnik   4/2/2018
  Signature                   Print Name        Date

Owner / Authorized Representative: Signer's name must appear in Section 5

X _____   _____   _____
  Signature                   Print Name        Date

**If any of the information provided in this Merchant Application and Agreement changes, you must promptly notify Chase Paymentech of such change(s).**

Exhibit 1

DocuSign Envelope ID: 9AB5A87A-B733-4DBB-999D-5EF32C309B8F

Case 4:18-cv-01155-JAR Doc. #: 59-90-1 Filed: 02/17/20 Page: 12 of 30 PageID #: 1799

Internal Use Only: Approved by Paymentech, LLC for itself and on behalf of JPMorgan Chase Bank, N.A.

| X | | |
|---|---|---|
| Signature | Print Name | Date |

## TERMS AND CONDITIONS

The Terms and Conditions together with the Application, pricing Schedules A and A-1 (if applicable), and any other documents referrenced herein form the legal agreement between you ("Merchant"), Paymentech, LLC ("Chase Paymentech"), and JPMorgan Chase Bank, N.A. ("Member") for processing your Payment Card Transactions. Chase Paymentech has agreed to acquire and process your Payment Card Transactions as well as pay you the amount of each Payment Card Transaction subject to the terms of this Agreement. You agree to pay us for the Services performed and to comply with the Payment Brand Rules, Security Standards, operating procedures and all applicable laws, as further described in this Agreement.

### 1. MERCHANT'S ACCEPTANCE OF PAYMENT CARDS.
**1.1 Exclusivity.**

**During the term of this Agreement, Merchant *shall*:**
(a) use *exclusively* Chase Paymentech for the Services; and
(b) submit all Transaction Data to Chase Paymentech in compliance with all specified formats and procedures.

**1.2 Payment Card Acceptance Policies and Prohibitions.**

**Merchant *shall*:**
(a) notify Chase Paymentech, on its Application or otherwise in writing, of all of Merchant's Payment Card acceptance methods (e.g. card-present, card-not-present, recurring transactions, etc.);
(b) accept all categories of Visa and MasterCard Payment Cards, unless Merchant has notified Chase Paymentech on its Application or otherwise in writing of Merchant's election to accept one of the following "limited acceptance" options:
   i.   Visa and MasterCard *consumer credit (but not debit) cards* and Visa and MasterCard *commercial credit and debit cards only*; or
   ii.  Visa and MasterCard *debit cards only*;
(c) honor all foreign bank-issued Visa or MasterCard Payment Cards;
(d) publicly display appropriate signage to indicate all Payment Cards accepted by Merchant, including any limited acceptance categories;
(e) examine each Payment Card (credit, debit, etc.) presented at the point of sale to ensure the Payment Card is valid, has not expired and that the Customer's signature on the Transaction Receipt corresponds to the authorized signature on the back of the Payment Card;
(f)  in situations where the Payment Card is not physically presented to Merchant at the point of sale (e.g. on-line, mail order, telephone order, pre-authorized, or recurring transactions), have appropriate procedures in place to ensure that each Transaction is made only to the Customer;
(g) provide the Customer with a Transaction Receipt for each Transaction.  All Transaction Receipts must conform to Payment Brand Rules; and
(h) prominently and clearly inform Customers of its identity so that the Customer can distinguish Merchant.

**Except to the extent permitted by law or the Payment Brand Rules, Merchant *shall not*:**

(i) set a dollar amount above or below which Merchant refuses to honor otherwise valid Payment Cards;
(j) issue a Refund in cash or a cash equivalent (e.g. checks) for any Transaction originally conducted using a Payment Card;
(k) request or use a Payment Card account number for any purpose other than to process a payment for goods or services sold; or
(l) add any tax or surcharge to a Transaction; if any tax or surcharge amount is imposed, Merchant must have notified Paymentech and the Payment Brands at least thirty days before, such amount must be included in the Transaction amount,  shall not be collected separately, and Merchant's surcharging practices must comply with applicable laws and Payment Brand Rules.

**Merchant *shall not*:**
(m) require a Customer to complete a postcard or similar device that includes Payment Instrument Information in plain view when mailed;
(n) require the Customer to pay the fees payable by Merchant under this Agreement;
(o) split a single Transaction into two or more Transactions to avoid or circumvent authorization limits or monitoring programs; and

Exhibit 1

(p) accept Payment Cards for the purchase of scrip, as defined by the Payment Brand Rules.

    **Merchant *may*:**

    (q) request or encourage a Customer to use a Payment Card other than the Payment Card initially presented by the Customer, unless prohibited by the Payment Brand Rules or applicable law

## 1.3 Payment Brand Rules.

    **Merchant agrees to comply with:**

    (a) all applicable Payment Brand Rules in effect from time to time; and

    (b) such other procedures as Chase Paymentech may from time to time prescribe for the creation or transmission of Transaction Data.

## 1.4 Requirements for Certain Transactions.

    **Merchant represents and warrants that each Transaction:**

    (a) represents payment for or Refund of a bona fide sale or lease of the goods, services, or both, which Merchant has the legal right to sell and which is provided by Merchant in the ordinary course of its business, as represented in its Application;

    (b) is not submitted on behalf of a third party;

    (c) represents a current obligation of the Customer solely for the amount of the Transaction;

    (d) does not represent the collection of a dishonored check or the collection or refinancing of an existing debt;

    (e) represents goods that have been provided or shipped, or services that have actually been rendered, to the Customer;

    (f) is free from any material alteration not authorized by the Customer;

    (g) or the amount thereof, is not subject to any dispute, setoff, or counterclaim;

    (h) if such Transaction represents a credit to a Customer's Payment Card, is a Refund for a Transaction previously submitted to Chase Paymentech; and

    (i) complies with the terms of this Agreement, applicable laws and all applicable Payment Brand Rules.

    **Furthermore, Merchant represents and warrants that Merchant has *not*:**

    (j) disbursed or advanced any cash to the Customer (except as authorized by the Payment Brand Rules) for itself or to any of its representatives, agents, or employees in connection with the Transaction;

    (k) accepted payment for effecting credits to a Customer or a Customer's Payment Card;

    (l) made any representation or agreement for the issuance of Refunds except as stated in Merchant's Refund Policy;

    (m) been provided with any information that would lead Merchant to believe that the enforceability or collectibility of the Transaction is in any manner impaired; and

    (n) submitted any Transaction that Merchant knows or should have known to be either fraudulent, illegal, damaging to the Payment Brand(s), not authorized by the Customer, or otherwise in violation of any provision of this Agreement, applicable law, or Payment Brand Rules.

    **For Transactions stemming from recurring billing, installment plans, deferred payment plans, or prepayment plans, Merchant *shall*:**

    (o) obtain permission from Chase Paymentech prior to submitting such Transactions for processing under this Agreement;

    (p) for approved prepayments, advise the Customer:

        i. that payment is being made in advance of the shipment or provision of goods or services; and

        ii. the time when shipment or provision of the goods or services is expected;

    (q) obtain the Customer's consent to periodically charge the Customer's Payment Card on a recurring or periodic basis for the goods or services purchased, and:

        i. retain this permission for the duration of the recurring services and provide it upon request to Chase Paymentech or the issuing bank of the Customer's Payment Card; and

        ii. retain written documentation specifying the frequency of the recurring charge and the duration of time during which such charges may be made;

    (r) prepare and submit for processing separate Transaction Data for each recurring, installment, or deferred payment only on the dates the Customer agreed to be charged and include in the Transaction Data the electronic indicator that the Transaction is a recurring one; and

    (s) not submit such Transactions after receiving:

        i. a cancellation notice from the Customer; or

        ii. notice from Chase Paymentech or any Payment Brand (via authorization code or otherwise) that the Payment Card is not to be honored.

Exhibit 1

**2. AUTHORIZATIONS.** Merchant is required to obtain an authorization code through Chase Paymentech for each Transaction. Chase Paymentech reserves the right to refuse to process any Transaction Data presented by Merchant unless it includes a proper authorization. If required by the Payment Brand Rules, each authorization request must include the Payment Card's expiration date.

**Merchant acknowledges:**

    (a) that authorization of a Transaction indicates only that the Payment Card contains a valid account number and has an available balance sufficient for the amount of the Transaction; and

    (b) that authorization of a Transaction does not constitute a representation from Chase Paymentech, a Payment Brand, or a card issuing bank that a particular Transaction is, in fact, valid or undisputed by the actual Customer.

**3. REFUND AND ADJUSTMENT POLICIES AND PROCEDURES; PRIVACY POLICIES.**

**3.1 Refund Policy.** Chase Paymentech reserves the right to refuse to process any Transaction made subject to a Refund Policy of which Chase Paymentech has not been notified in advance.

**Merchant _shall_:**

    (a) maintain a Refund Policy (e.g. "NO REFUNDS", "REFUNDS WITH ORIGINAL RECEIPT WITHIN 30 DAYS OF ORIGINAL SALE") in accordance with the Payment Brand Rules;

    (b) disclose all Refund Policies to Chase Paymentech and to Merchant's Customers; and

    (c) submit to Chase Paymentech, in writing, any material change in Merchant's Refund Policy not less than 14 days prior to the effective date of such change.

**3.2 Procedure for Refund Transactions.**

**If Merchant allows a Refund, Merchant _shall_:**

    (a) prepare and deliver to Chase Paymentech Transaction Data reflecting any such Refund within three (3) days of approving the Customer's request for such Refund;

    (b) not permit the amount of a Refund to exceed the amount shown as the total on the original Transaction Receipt except by the exact amount required to reimburse the Customer for shipping charges that the Customer paid to return merchandise;

    (c) not accept any payment from a Customer as consideration for issuing a Refund; and

    (d) not give cash (or cash equivalent) refunds to a Customer in connection with a Transaction, unless required by law or permitted by the Payment Brand Rules.

**3.3 Customer Data Protection Policies for Ecommerce Merchants.**

**If Merchant operates an electronic commerce website through which Transactions are generated, in addition to any requirements otherwise set forth in this Agreement, Merchant _shall_:**

    (a) display the following on each electronic commerce website:

    i.  Merchant's name and the name that will appear on the Customer's Payment Card statement

    ii.  its Customer data privacy policy;

    iii.  a description of its security capabilities and policy for transmission of Payment Instrument Information; and

    iv.  the address of Merchant's fixed place of business (regardless of website or server locations); and

    (b) offer its Customers a data protection method such as 3-D Secure or Secure Sockets Layer (SSL).

**4. SETTLEMENT.**

**4.1 Submitting Transaction Data.** If Merchant fails to send Transaction Data to Chase Paymentech within one (1) business day after the day of the Transaction, higher interchange fees, additional costs, and increased Chargebacks could occur. Chase Paymentech may from time to time contact Customers to verify that they have received goods or services for which Transactions have been submitted. Chase Paymentech reserves the right to refuse to process any Transaction Data presented by Merchant if Chase Paymentech believes that the Transaction amount cannot be collected from the Customer or was prepared in violation of any provision of this Agreement, applicable law, or the Payment Brand Rules.

**4.2 Merchant's Settlement Account.** In order to receive funds from Chase Paymentech, Merchant must designate (via the Application or otherwise) and maintain one or more bank account(s) at a bank that is a member of the Automated Clearing House system or the Federal Reserve wire system. All such designated bank accounts are collectively referred to herein as "Settlement Account". Merchant's Settlement Account must be established and maintained solely for business purposes and shall not be used for personal, family or household purposes. Chase Paymentech will not be liable for any delays in receipt of funds or errors in Settlement Account entries caused by third

Exhibit 1

parties, including, without limitation, delays or errors by the Payment Brands or Merchant's bank.

**During the term of this Agreement, and thereafter until Chase Paymentech notifies Merchant that all amounts due from Merchant under this Agreement have been paid in full, Merchant:**

    (a) **shall _not_** close its Settlement Account without giving Chase Paymentech at least five (5) days' prior written notice and substituting another Settlement Account;

    (b) is solely liable for all fees, costs, and overdrafts associated with the Settlement Account; and

    (c) authorizes Chase Paymentech, or its authorized agent(s) to initiate electronic credit and debit entries and adjustments to the Settlement Account, or any other bank account designated by Merchant in writing, at any time without regard to the source of any monies in the Settlement Account.

**4.3 Conveyed Transactions.** Conveyed Transactions are Transactions that Merchant submits to Chase Paymentech, but which are then conveyed to one or more third parties or Payment Brands for settlement and funding directly by them to Merchant (e.g. American Express Transactions). For Conveyed Transactions Merchant must have a valid agreement in effect with the applicable third party or Payment Brand. Payment of proceeds due Merchant for Conveyed Transactions will be governed by such agreement, and Chase Paymentech does not bear any responsibility or liability for performing or failing to perform any term, condition, or covenant under Merchant's agreement with any third party concerning Conveyed Transactions, including, without limitation, the funding and settlement of Merchant's Conveyed Transactions. If Merchant submits Conveyed Transactions to Chase Paymentech and Merchant does not have a valid agreement with the applicable third party or Payment Brand, Chase Paymentech may, but is not obligated to, convey such Transaction Data to the applicable third party or Payment Brand and to share with them information about Merchant (from the Application or otherwise) as may be required to approve Merchant's acceptance of the Conveyed Transaction. If Merchant accepted American Express Payment Cards through the American Express OptBlue Program and no longer can do so because Merchant became a High CV Merchant, in order to accept American Express Payment Cards through Conveyed Transactions, it must enter into a direct relationship with American Express by executing American Express's then current card acceptance agreement.

**4.4 Funding Merchant for Settled Transactions.** Subject to Section 4.3, for all Transactions, Chase Paymentech will submit Merchant's Transaction Data to the applicable Payment Brand. Promptly after Chase Paymentech receives funds for Settled Transactions from the Payment Brands, Chase Paymentech will provisionally fund Merchant's Settlement Account.

The dollar amount payable to Merchant for Settled Transactions will be equal to the amount submitted by Merchant in connection with its sale Transactions **_minus_** the sum of the following:

    (a) all fees, charges, and other amounts described on Schedule A or that Merchant has otherwise agreed to pay;

    (b) all Refund Transactions and Chargebacks;

    (c) all Reserve Account amounts (as defined in Section 4.6); and

    (d) all fees, charges, fines, assessments, penalties, or other liabilities (and all related costs and expenses incurred by Chase Paymentech) that may be imposed on Chase Paymentech or Member from time to time by the Payment Brands.

In the event Chase Paymentech does not deduct amounts owed by Merchant from Merchant's proceeds when such amounts are due and payable, Merchant agrees to pay all such amounts to Chase Paymentech immediately without any deduction or offset. Chase Paymentech may debit Merchant's Settlement Account for any such amounts.

**4.5 Negative Amounts.** Merchant shall maintain sufficient funds in the Settlement Account to prevent the occurrence of a negative balance. In the event that the proceeds from Merchant's Settled Transactions or the balance of Merchant's Settlement Account are not sufficient to pay amounts due from Merchant under this Agreement, Chase Paymentech may, in addition to any other rights and remedies under this Agreement, pursue any one or more of the following:

    (a) demand and receive immediate payment for such amounts;

    (b) debit the Settlement Account for the amount of the negative balance;

    (c) apply funds held in the Reserve Account against the negative amount; or

    (d) withhold all or some of Merchant's Settlement funds and apply them against the negative amount.

**4.6 Reserve Account.** To protect itself against Anticipated Risks arising out of or relating to Merchant's acceptance of Payment Instruments, Chase Paymentech may, from time to time, temporarily suspend or delay payment to Merchant of amounts due under this Agreement, or designate an amount of funds that Paymentech must maintain, and establish an account with such funds (the "Reserve Account").

**Anticipated Risks include, but are not limited to, risks associated with:**

    (a) a material breach of the Agreement by Merchant;

    (b) providing Services to Merchant in light of Merchant's financial condition or payment history with creditors;

Exhibit 1

    (c) Chargebacks;
    (d) Refunds;
    (e) unshipped goods or unfulfilled services;
    (f) fines, fees, or penalties assessed or reasonably anticipated to be assessed against Chase Paymentech or Member by any of the Payment Brands arising out of or relating to Merchant's:
        i. acceptance of Payment Cards;
        ii. acts or omissions;
        iii. Chargebacks; or
        iv. failure to comply with the Payment Brand Rules or Security Standards
    (g) Merchant's failure to respond to an inquiry, or request for information, from Paymentech, Member or the Payment Brands;
    (h) objections or concerns expressed by a Payment Brand that makes it unduly burdensome, impractical or risky to continue processing Merchant's Transactions; and
    (i) all anticipated trailing activity arising from Merchant's Transactions after termination of this Agreement.

**The Reserve Account***:*
    (j) shall contain sufficient funds to cover:
        i. any unbilled processing costs; and
        ii. Chase Paymentech's estimated exposure based on Anticipated Risks;
    (k) may be funded in the same manner as provided for negative balances in Section 4.5(a) – (d);
    (l) will be held and controlled by Chase Paymentech (and funds therein may be comingled with other funds); and
    (m) will not bear interest.

**Upon the establishment of a Reserve Account, Merchant *shall:***
    (n) irrevocably grant to Chase Paymentech a security interest in any interest Merchant may now have or later acquire in any and all funds, together with the proceeds thereof, that may at any time be in the Reserve Account and that would otherwise be payable to Merchant pursuant to the terms of this Agreement; and
    (o) execute and deliver to Chase Paymentech such instruments and documents that Chase Paymentech may reasonably request to perfect and confirm the security interest in the Reserve Account funds.

**Chase Paymentech:**
    (p) may (but is not required to) apply funds in the Reserve Account toward, and set off any funds that would otherwise be payable to Merchant against, the satisfaction of any amounts which are or may become due from Merchant pursuant to this Agreement; and
    (q) will pay to Merchant any funds remaining in the Reserve Account after Merchant:
        i. satisfies all of its obligations under this Agreement; and
        ii. executes all documents reasonably requested by Chase Paymentech in connection with the return of any Reserve Account funds.

## 5. ACCOUNTING.
**5.1 Statements and Reporting**. Chase Paymentech will supply a detailed statement (or online access thereto) reflecting the activity of Merchant's account(s). If Merchant accesses account statements via the internet, Merchant must ensure that such online access is secure.

**5.2 Adjustments**. If Merchant believes any adjustments should be made to its Settlement Account, Merchant must notify Chase Paymentech in writing within 90 days after any such adjustment is or should have been made. Chase Paymentech has no obligation to research or affect changes to Merchant's Settlement Account which are not brought to Chase Paymentech's attention within 90 days after Merchant received its activity statement.

## 6. RETRIEVAL REQUESTS.
A Retrieval Request is a request for information by a Customer or Payment Brand relating to a claim or complaint concerning a Transaction submitted by Merchant. Because a Retrieval Request requires Merchant to provide Chase Paymentech with specific Transaction information, Merchant must store and retain Transaction Data and Transaction Receipts, but must do so solely in compliance with the Payment Brand Rules and the Security Standards. Merchant acknowledges that failure to fulfill a Retrieval Request timely and in accordance with Payment Brand Rules may result in an irreversible Chargeback. If Chase Paymentech receives a Retrieval Request, Chase Paymentech will forward the same to Merchant.

**Upon receiving a Retrieval Request, Merchant *shall***:
    (a) respond to the Retrieval Request within the time frame provided; and
    (b) include with Merchant's response the following documentation:
        i. a written resolution of Merchant's investigation of the Retrieval Request; and

Exhibit 1

## 7. CHARGEBACKS.

**7.1 Chargeback Reasons.** Merchant is liable for all Chargebacks. Some of the most common reasons for Chargebacks include:

(a) Merchant fails to issue a Refund to a Customer after the Customer returns or does not receive goods or services;

(b) Merchant did not obtain an authorization/approval code, as required under Section 2;

(c) The Transaction Data was prepared incorrectly or fraudulently;

(d) Chase Paymentech did not receive Merchant's response to a Retrieval Request in accordance with Section 6;

(e) The Customer disputes the Transaction or the authenticity of the signature on the Transaction Receipt, or claims that the Transaction is subject to a set-off, defense, or counterclaim;

(f) The Customer refuses to make payment for a Transaction because, in the Customer's opinion, a claim or complaint has not been resolved or has been resolved in an unsatisfactory manner; and

(g) The Customer disputes making the Transaction and the Payment Card was not physically presented at the time of the Transaction. In this case Merchant acknowledges that if the Merchant does not have an electronic record or physical imprint of the Payment Card, the Payment Brand Rules may not allow the Merchant to challenge the Chargeback.

**7.2 Responding to Chargebacks.** If Merchant has reason to dispute or respond to a Chargeback, then Merchant must do so by the date provided on the applicable Chargeback notice. If Merchant misses the Chargeback due date, Chase Paymentech has no obligation to investigate or attempt to obtain a reversal or other adjustment to any Chargeback on Merchant's behalf. Upon receiving a Chargeback, Merchant may resubmit the applicable Transaction Data for a second presentment if permitted by the Payment Brand Rules.

**7.3 Excessive Chargebacks.** If Merchant is receiving an excessive amount of Chargebacks, in addition to Chase Paymentech's other remedies under this Agreement, Chase Paymentech may do any one or more of the following:

(a) review Merchant's internal procedures relating to acceptance of Payment Cards and notify Merchant of new procedures Merchant should adopt in order to avoid future Chargebacks;

(b) notify Merchant of a new rate Chase Paymentech will charge to process Merchant's Chargebacks;

(c) require Merchant to replace any magnetic-strip-only point of sale terminal or electronic cash registered with an EMV chip-capable terminal, if required under the Payment Brand Rules

(d) establish a Reserve Account; or

(e) terminate the Agreement in accordance with Section 10.3.

Merchant understands that having excessive Chargebacks may result in assessments, fines, fees, and penalties by the Payment Brands. Merchant agrees to reimburse Chase Paymentech immediately for any such assessments, fines, fees, and penalties imposed on Chase Paymentech or the Member and any related loss, cost, or expense incurred by Chase Paymentech or the Member.

## 8. DISPLAY OF PAYMENT BRAND MARKS.
Payment Brand Marks are the brands, emblems, trademarks, and logos that identify a Payment Brand. Merchant has no ownership rights in the Payment Brand Marks and cannot assign its right to use the Payment Brand Marks under this Agreement to any third party.

**Merchant shall:**

(a) use the Payment Brand Marks only as expressly permitted by the Payment Brand Rules;

(b) use the Payment Brand Marks only to promote the services covered by the Marks;

(c) **not** use the Payment Brand Marks in any way that could cause Customers to believe that the goods or services offered by Merchant are sponsored, endorsed, or guaranteed by Chase Paymentech, Member or the Payment Brands; and

(d) cease using the Payment Brand Marks when this Agreement terminates.

## 9. FEES AND ADJUSTMENTS; CHASENET TRANSACTIONS.

**9.1 Schedule A.** Merchant:

(a) shall pay all applicable fees for all Transactions, which are calculated and payable pursuant to this Agreement and which may be adjusted from time to time in accordance with Section 9.2;

(b) acknowledges that the fees payable under this Agreement and stated in Schedule A:

i. are based upon Merchant's annual volume, average Transaction size, and other information provided by Merchant or contained in this Agreement;

ii. are based upon the assumption that Merchant's Transactions will qualify for certain interchange rates as determined in each case by the applicable Payment Brand; If any of Merchant's Transactions fail to qualify

Exhibit 1

for such interchange rates, Chase Paymentech will process each such Transaction at the applicable interchange rate determined by the applicable Payment Brand; and

   iii.  will be rounded up to the next full cent to the extent they contain a fraction of a cent; and

is solely responsible for all communication expenses required to facilitate the transmission of all Transaction Data to Chase Paymentech.

**9.2  Adjustments.**    The fees owed by Merchant under this Agreement (under Schedule A or any additional pricing supplement) may be adjusted at any time:

   (a) with thirty (30) days' prior written notice;
   (b) to reflect increases in interchange, assessments, or other Payment Brand fees;
   (c) to reflect additional fees imposed by the Payment Brands; or
   (d) to reflect increases in, or additions to, third party fees.

All adjustments hereunder will be effective either upon the date set forth in the written notice or upon the date the corresponding increase or additional fee is implemented by the Payment Brand or third party provider.

**9.3 ChaseNet Transactions**.  If, and only if, Schedule A attached to this Agreement sets forth the fees specifically for ChaseNet Transactions, then, in addition to all other obligations under this Agreement, the following apply:

   (a) the parties agree that Paymentech and Member will treat Merchant's qualifying  involving Eligible Chase Accounts as ChaseNet Transactions, and the provisions of this Agreement governing ChaseNet Transactions shall apply.
   (b) Merchant acknowledges receipt of, or access to, the Chase Requirements and agrees to abide by the Chase Requirements with respect to its ChaseNet Transactions.  The Chase Requirements are confidential and Merchant may not disclose the Chase Requirements to any third party without the prior written consent of Paymentech and Member; and
   (c) the amounts due for ChaseNet Transactions are set forth on Schedule A attached hereto.

**10.  TERM AND TERMINATION.**

**10.1  Term.**  This Agreement starts on the day it is accepted and agreed to by Chase Paymentech (the "Effective Date").  This Agreement will continue in full force and effect until it is terminated by Merchant under Section 10.2, or by Chase Paymentech under Section 10.3.

**10.2 Merchant Termination**.  Subject to the terms of this Section 10.2, Merchant may terminate this Agreement at any time by giving thirty (30) days' prior notice to Chase Paymentech.

> **PLEASE READ THIS PROVISION CAREFULLY.  IT APPLIES DURING THE FIRST 24 MONTHS IF:  MERCHANT (A) TERMINATES THIS AGREEMENT, OR (B) FAILS TO MAINTAIN AN ACTIVE ACCOUNT; AND MERCHANT RECEIVED A PROMOTIONAL CONSIDERATION FROM CHASE PAYMENTECH.**

Merchant may be obligated to repay all, or a prorated portion of, any Promotional Consideration Merchant received when it signed up with Chase Paymentech.  A Promotional Consideration is:

   (a)  a signing bonus;
   (b)  a free point of sale terminal or other equipment;
   (c)  the waiver of any applicable fees; or
   (d)  any other item of value, which was extended to Merchant in consideration of entering into this Agreement.

In the event Merchant's repayment of the Promotional Consideration is limited by applicable law, the amount owed to Chase Paymentech is limited to the maximum amount permitted under applicable law.  Any amount owed to Chase Paymentech under this Section 10.2 or Section 10.4 will be funded in the same manner as provided for negative balances in Section 4.5.

**10.3  Chase Paymentech Termination**.  Chase Paymentech may terminate this Agreement at any time by giving thirty (30) days' prior notice to Merchant.  Furthermore, Chase Paymentech may terminate this Agreement *immediately* if:

   (a) Merchant is determined to have excessive Chargebacks;
   (b) Chase Paymentech determines, in its reasonable discretion, that Merchant's Transactions present increased or excessive Anticipated Risks;
   (c) any representation or warranty in the Agreement, including the Application or Schedule A, is determined to be incorrect in any respect when made or deemed to be made;
   (d) Merchant fails to comply with any term, covenant, condition, or agreement contained in this Agreement;
   (e) a case or other proceeding is commenced by or against Merchant in any court of competent jurisdiction seeking relief under the Bankruptcy Code or under any other laws, domestic or foreign, relating to bankruptcy,

Exhibit 1

insolvency, reorganization, winding up, or adjustment of debts, the appointment of a trustee, receiver, custodian, liquidator, or the like of Merchant, or of all or any substantial part of the assets, domestic or foreign, of Merchant, and such case or proceeding continues undismissed or unstayed for a period of 60 consecutive days, or an order granting the relief requested in such case or proceeding against Merchant (including, without limitation, an order for relief under the Bankruptcy Code) is entered;

(f) Chase Paymentech, in its reasonable discretion, deems Merchant to be financially insecure;

(g) any Payment Brand:

    i. notifies Chase Paymentech or Member that it is no longer willing to accept Merchant's Transaction Data; or

    ii. requires Chase Paymentech or Member to terminate or limit this Agreement or Merchant's ability to accept Payment Cards from Customers;

(h) Merchant or any person owning or controlling Merchant's business is listed in one or more databases of terminated or high risk merchants maintained by the Payment Brands; or

(i) Merchant engages in conduct that

    i. creates or could tend to create harm or loss to the goodwill of any Payment Brand, Chase Paymentech, or Member; or

    ii. causes Paymentech or Member to violate the Payment Brand Rules or applicable law; or

    iii. results in Paymentech's, Member's, or Merchant's participation in a risk-based program under the Payment Brand Rules.

If this Agreement is terminated by Chase Paymentech, Merchant acknowledges that Chase Paymentech may be required to report Merchant's business name, and information about its principals, to the Payment Brands, and Merchant expressly agrees and consents to such reporting.

**10.4  Active Account**. Merchant's account will be considered "Active" as long as Merchant continues to make on-time payments of all amounts owed under the Agreement.  But, if Merchant goes more than 90 consecutive days without making an on-time payment of amounts due under the Agreement, Chase Paymentech ***may:***

(a) consider the Merchant's account as ***not*** Active;

(b) terminate this Agreement immediately; and

(c) subject to Section 10.2, collect all or a prorated portion of any Promotional Consideration.

**10.5  Post Termination.**  The termination of this Agreement will not affect either party's rights or obligations with respect to Transactions submitted prior to termination.  Therefore, the provisions governing processing and settlement of Transactions, all related adjustments, fees, and other amounts due from Merchant, and the resolution of any related Chargebacks, disputes, or other issues involving Transactions, will continue to apply for all Transactions made prior to termination.

**Upon termination of this Agreement, Merchant *shall*:**

(a) continue to be responsible for all Chargebacks, fees, fines, assessments, credits, and adjustments resulting from Transactions processed pursuant to this Agreement before termination; and

(b) be responsible for all amounts then due or which thereafter may become due to Chase Paymentech or Member under this Agreement.

**Upon termination or notice of termination of this Agreement, Paymentech may, in its sole discretion and without waiving any of its rights or remedies under this Agreement:**

(a) establish a Reserve Account; and

(b) process Transaction Data submitted by Merchant after termination in accordance with and subject to all of the terms of this Agreement.

**11. INDEMNIFICATION.**  Merchant agrees to indemnify Chase Paymentech, Member, the Payment Brands, and their respective affiliates, officers, directors, employees, agents, and sponsoring banks from any losses, liabilities, and damages of any and every kind (including, without limitation, Chase Paymentech's costs, expenses, and reasonable attorneys' fees) arising out of or related to:

(a) Chase Paymentech's reliance on the information provided by Merchant, or Merchant's Authorized Representative, on the Application or in conjunction with the Application (including any information with respect to Merchant's financial condition);

(b) any assessment, fine, or penalty imposed on Chase Paymentech or the Member, and any related loss, cost, or expense incurred by Chase Paymentech or the Member; and

(c) any claim, complaint, or Chargeback:

    i. made or claimed by a Customer with respect to any Transaction or Transaction Data submitted by Merchant;

    ii. caused by Merchant's noncompliance with this Agreement, applicable law, or the Payment Brand Rules

Exhibit 1

(including, without limitation, any breach of a representation or warranty made by Merchant or Merchant's failure to comply with the Security Standards);

    iii. resulting from any voluntary or involuntary bankruptcy or insolvency proceeding by or against Merchant; or

    iv. related to Chase Paymentech's reporting of Merchant, or any person owning or controlling Merchant's business, to the Payment Brands for inclusion  in one or more databases of terminated or high risk merchants maintained by the Payment Brands.

The indemnification provided for in this Section does not apply to any claim or complaint to the extent it is caused by Chase Paymentech's own gross negligence or willful misconduct.  The indemnification provided for in this Section shall survive termination and is subject to the limitation of liability set forth in Section 15.


## 12. TRANSACTION DATA, PAYMENT CARD INFORMATION AND PAYMENT CARD INDUSTRY COMPLIANCE.

**Merchant acknowledges that its:**

(a) failure, or the failure of any of its Service Providers, to comply with the Payment Brand Rules, including the Security Standards, or the compromise of any of Transaction Data or Payment Card Information (whether such Payment Card Information is under the control of Merchant or its Service Provider) may result in assessments, fines, and penalties by the Payment Brands and termination of this Agreement; and

(b) use of any fraud mitigation or security enhancement solution (e.g. an encryption product or service), whether provided to Merchant by Chase Paymentech or a third party, in no way limits Merchant's obligation to comply with the Security Standards or Merchant's liabilities set forth in this Agreement.

**Merchant *shall not*:**

(c) disclose Payment Card Information, except:

    i. to select employees, agents, and contractors on a "need to know" basis, solely for the purpose of assisting Merchant in completing a Transaction or otherwise complying with this Agreement; or

    ii. as specifically required by the Security Standards, Payment Brand Rules, applicable law, or government/regulatory demand;

(d) use Payment Card Information, except:

    i. to complete a Transaction; or

    ii. as specifically permitted by this Agreement, the Security Standards, Payment Brand Rules, or applicable law; and

(e) sell, transfer, or disclose to third parties any materials that contain Transaction Data or Payment Card Information in the event of Merchant's failure, including bankruptcy, insolvency, or other suspension of business operations.

**Merchant *shall*:**

(f) comply with the Security Standards, Payment Brand Rules, and all applicable laws relating to the security, storage, and disclosure of Transaction Data and Payment Card Information;

(g) provide Chase Paymentech, upon its request, with all tests, scans, and assessments evidencing Merchant's compliance with the Security Standards, Payment Brand Rules, and applicable laws;

(h) store and discard Transaction Data, Payment Card Information, and all media containing Payment Card Information in compliance with Payment Brand Rules and Security Standards;

(i) notify Chase Paymentech immediately if Merchant determines or suspects that Transaction Data or Payment Card Information has been compromised and assist Chase Paymentech in providing notification to all interested parties as may be required by law or Payment Brand Rules, or as Chase Paymentech otherwise reasonably deems necessary;

(j) notify Chase Paymentech immediately of its use of any Service Provider and Payment Application;

(k) ensure that all Service Providers and Payment Applications used by Merchant:

    i. comply with the Security Standards;

    ii. are recognized by the Payment Brands as being compliant with the Security Standards; and

    iii. are registered with each applicable Payment Brand as a third party service provider for a Paymentech customer.

(l) provide, or cause its Service Provider to provide, Paymentech with the information it needs to register the Service Provider with the Payment Brands;

(m) cause its Service Provider to cooperate with Paymentech in completing registration with the Payment Brands;

(n) pay, or cause its Service Provider to pay, all amounts required by the Payment Brands to register the Service Provider;

(o) ensure that all EMV chip-capable terminals used by Merchant appear on the EMV co-approved terminal list maintained by the Payment Brands;

(p) reimburse Chase Paymentech immediately for any assessment, fine, or penalty imposed on Chase Paymentech or the Member and any related loss, cost, or expense incurred by Chase Paymentech or the

Exhibit 1

Member related to or arising from Merchant's acceptance of Payment Cards;

(q) cooperate with, and cause all applicable Service Providers to cooperate with, any forensic examination or other audit required by the Payment Brands, Chase Paymentech or Member because of a Data Compromise Event;

(r) pay for all costs and expenses related to a forensic examination or other audit required by the Payment Brands, Chase Paymentech, or Member (including all of Chase Paymentech's reasonable attorneys' fees and other costs related to the forensic exam or audit);

(s) take all actions necessary to achieve and maintain compliance in accordance with the results of, and in the time frame set forth in, a forensic examination or audit report from Chase Paymentech, the Payment Brands, or Member; and

(t) upon request, return all materials that contain Transaction Data or Payment Card Information to Chase Paymentech or provide Chase Paymentech with acceptable proof of its destruction.

**Chase Paymentech may:**

(u) share Merchant's financial information, information related to Merchant's Transactions, and other information provided by Merchant with Chase Paymentech's affiliates and the Payment Brands;

(v) use or disclose information related to Merchant's Transactions:

   i. as necessary to process Merchant's Transactions or otherwise provide Services and maintain Merchant's account pursuant to this Agreement;

   ii. to detect prevent, reduce, or otherwise address fraud, security, or technical issues;

   iii. to enhance or improve Chase Paymentech's products and Services generally; or

   iv. as required or permitted by the Payment Brands or applicable law;

(w) prepare, use, or share with third parties, aggregated, non-personally identifiable information derived from Transaction Data of all of Chase Paymentech's customers or specific segments of Chase Paymentech's customers;

(x) require, in its sole discretion, or based on information provided by the Payment Brands, a forensic examination of Merchant or Merchant's Service Providers due to a Data Compromise Event or suspected event;

(y) require Merchant or Merchant's Service Provider to engage a forensic examiner in order to expedite the investigation of the Data Compromise Event or suspected event. Alternatively, Chase Paymentech may engage a forensic examiner on Merchant's or Merchant's Service Provider's behalf; and

(z) investigate a Data Compromise Event of Merchant, if permitted under the Payment Brand Rules.

## 13. INFORMATION ABOUT MERCHANT AND MERCHANT'S BUSINESS.

**13.1 Additional Financial Information.** Upon five (5) days' written notice at any time, Merchant, and each Guarantor (if any), agrees to furnish to Chase Paymentech all financial statements and information as Chase Paymentech may reasonably request. Merchant's and each Guarantor's signature on this Agreement authorizes Chase Paymentech to perform any credit check deemed necessary with respect to Merchant and each Guarantor, as applicable.

**13.2 Audit Rights; Site Visit; Website Inspection.** With prior notice and during Merchant's normal business hours, Chase Paymentech's duly authorized representatives may visit Merchant's business premises and may examine Merchant's books and records that pertain to Merchant's Transactions or Merchant's compliance with this Agreement. Furthermore, Merchant may be contacted by Chase Paymentech or a third party contracted by Chase Paymentech who will need to gain access to Merchant's business operation to perform a site visit and inspection (the "Site Visit") in compliance with Payment Brand Rules. The Site Visit will include, among other things, an interview with Merchant regarding the nature of Merchant's business, as well as photographs of Merchant's business operation. If Merchant is unavailable for the Site Visit as scheduled, Chase Paymentech may suspend the settlement of Merchant's Transactions until a Site Visit can be completed and approved by Chase Paymentech. If Merchant operates an ecommerce website, Chase Paymentech is obligated under the Payment Brand Rules to investigate the contents of such website, either directly or through review of screen shots presented to Chase Paymentech by Merchant (the "Website Inspection"). Chase Paymentech may suspend the settlement of Merchant's Transactions until a Website Inspection can be completed and approved by Chase Paymentech. In the event that Merchant fails to reasonably cooperate with the required Site Visit or Website Inspection, or in the event the results of the Site Visit or the Website Inspection are not approved by Chase Paymentech, Chase Paymentech may terminate this Agreement immediately upon notice to Merchant.

**13.3 Notification to Chase Paymentech of Merchant's Changes.**

(a) Merchant agrees to provide Chase Paymentech at least 30 days' prior written notice of its intent to change current product lines or services, Merchant's trade name or legal name, or the manner in which Merchant accepts Payment Cards. If Chase Paymentech determines such a change is material to its relationship with Merchant, Chase Paymentech may refuse to process Transaction Data made subsequent to the change, temporarily suspend payment of settlement funds, or terminate this Agreement.

(b) Merchant agrees to provide Chase Paymentech with prompt written notice:

   i. if Merchant is the subject of any voluntary or involuntary bankruptcy or insolvency petition or proceeding; or

Exhibit 1

ii. of any:

    a. adverse change in Merchant's financial condition;

    b. planned or anticipated liquidation or substantial change in the basic nature of Merchant's business;

    c. transfer or sale of any substantial part (25% or more in value) of Merchant's total assets;

    d. judgment, writ, warrant of attachment, execution, or levy against any substantial part (25% or more in value) of Merchant's total assets not later than three days after Merchant obtains knowledge of any such judgment, writ, warrant of attachment, execution, or levy; or

    e. change in the control or ownership of Merchant or Merchant's parent if Merchant or Merchant's parent is not a corporation whose shares are listed on a national securities exchange or on an over-the-counter market.

**13.4 Referral Sources.** Merchant may have been referred to Chase Paymentech for the execution of this Agreement by a third party who has entered into a formal referral relationship with Chase Paymentech (a "Referral Partner"). If that is the case, Chase Paymentech will be the sole provider of the services necessary to authorize, process, and settle all of Merchants Transactions in accordance with the terms and conditions of the Agreement; however, Referral Partner may be involved in the servicing and maintenance of Merchant's merchant account. Therefore, notwithstanding anything to the contrary in the Agreement, Merchant hereby authorizes Chase Paymentech to share Merchant's financial information, information related to Merchant's Transactions (including Payment Instrument Information) and any other information that Merchant provides to Chase Paymentech with Referral Partner. Merchant understands and agrees that Chase Paymentech will not be responsible for Referral Partner's subsequent use or disclosure of such information.

**14.** AMERICAN EXPRESS **OptBlue Provisions.** Merchant, to participate in American Express OptBlue Program, agrees to comply with the requirements, acknowledgments and authorizations specific to Merchant's acceptance of American Express Payment Cards set forth in this Section 14. Further, Merchant, by participating in American Express OptBlue Program, agrees to the limited manner described in this Section 14 by which American Express may directly market and communicate to Merchant, or use and disclose information Merchant provides in connection with its participation in the OptBlue Program. The "OptBlue Program" is a program under which Chase Paymentech and other eligible third party acquirers may enable small merchants (defined as merchants that process American Express card transactions where the gross annual sales amount of such American Express card transactions is less than One Million U.S. Dollars) to accept American Express Payment Cards.

**14.1 Acceptance.** Merchant agrees to accept American Express Payment Cards only in accordance with the terms of the Agreement and the *American Express Merchant Operating Guide*, as may be amended from time to time and which is located at [www.americanexpress.com/merchantopguide](www.americanexpress.com/merchantopguide), provided however that (A) any Claim between Chase Paymentech and Merchant arising from or relating in any way to this Agreement or to the relationship formed between the parties as a result of this Agreement, even if relating to acceptance of the American Express Payment Card or otherwise involving or relating to American Express  (including claims to which American Express is a party or has a right to join), shall be brought in accordance with Section 16.11 of the Agreement and not the dispute resolution provisions of the *American Express Merchant Operating Guide*; (B) American Express's right to provide you information, notify you or otherwise provide you Solicitations (as hereinafter defined) shall be in accordance with Section 14.4 below and not the *American Express Merchant Operating Guide*; and (C) American Express's right to use Transaction Data and Merchant Data provided to American Express by Chase Paymentech shall be in accordance with Section 14.5 and not the *American Express Merchant Operating Guide*. American Express has asked Paymentech to inform Merchant that any claim brought by Merchant against American Express, to which Chase Paymentech is not a party, arising from or relating in any way to this Agreement is to  be resolved pursuant to the dispute resolution provisions of the *American Express Merchant Operating Guide*, provided that nothing in this Agreement shall provide any grounds for Paymentech to be a party  to any claim between Merchant and American Express that does not relate to this Agreement. For purposes of  the OptBlue Program **"Merchant Data"** means names, postal and email addresses, tax ID numbers, names and social security numbers of the authorized signer of Program Merchants and similar identifying information about Program Merchants. For clarification, Merchant Data does not include Transaction Data.

**14.1 Authorization**. Merchant hereby authorizes Chase Paymentech to submit Transactions to, and receive settlement from, American Express.

**14.2 Communication with Merchants**. By agreeing to use the "OptBlue" service, Merchant understands and agrees that American Express may communicate with Merchant to provide information about the OptBlue Program and other programs regarding the American Express network as set forth below, including:

1. "welcome acceptance" communications;

2. communications designed to inform Merchant how to increase Customers' usage of the American Express Card

Exhibit 1

(*e.g.*, information regarding posting of the American Express logo);

3.  communications required by law or to comply with directions from American Express regulators;

4.  communications necessary for Merchant to fulfill or comply with offers made by American Express to its Customers;

5.  communications under certain circumstances where American Express seeks to transfer Merchant to direct card acceptance program with American Express because Merchant's American Express transactions are more than $1 million annually or Chase Paymentech no longer participates in the OptBlue Program;

6.  communications about programs on the American Express network that are relevant to merchants participating in the OptBlue program, but do not include Solicitations (as defined below); and

7.  communications about the benefits to Merchant of accepting the American Express card, but do not include Solicitations.

**14.3 American Express Programs**.  Although American Express may send Merchant general information about American Express programs (*e.g.*, notifications about the occurrence of American Express's "Small Business Saturday" program or the availability of American Express's "Pay with Points" program as further described in Section 14.1 above), American Express will not directly solicit Merchant to register for, purchase or otherwise obtain products or services unrelated to the OptBlue Program ("Solicitations").  Merchant may, however, receive solicitations from American Express if it has provided the necessary data or consent directly to American Express outside the scope of this agreement).  To register for, purchase or otherwise obtain products or services from American Express unrelated to the OptBlue Program, please contact American Express directly by visiting the website http://www.americanexpress.com/privacy or calling American Express at 1-(800)-528-5200.

**14.4 Disclosure of Transaction Data and Merchant Data**.  Merchant understands and agrees that Chase Paymentech will disclose Transaction Data and Merchant Data to American Express, and American Express may use such information to perform its responsibilities in connection with the OptBlue Program, perform analytics and create reports, to communicate with Merchant in the manner permitted above and for any other lawful purposes (other than Solicitations).

**14.5 Protection of Merchant Data**.  American Express uses reasonable administrative, technical and physical security measures to protect the security and confidentiality of Merchant Data obtained from Chase Paymentech under this Agreement. American Express requires industry standard confidentiality and data security measures from third parties who are authorized by American Express to process data on its behalf. American Express only shares data in accordance with its data protection privacy principles, available here: https://www.americanexpress.com/us/content/customer-privacy-principles.html.

**14.6 High CV Merchants**.  Merchant hereby acknowledges that it may be converted from the OptBlue Program to a direct Payment Card acceptance relationship with American Express if and when it becomes a High CV Merchant. Merchant acknowledges that upon any such conversion, processing of any American Express Payment Card will be governed by American Express's then current card acceptance agreement (and not this Agreement) and American Express will be solely responsible for setting pricing and other fees payable by Merchant for acceptance of any American Express Payment Card.

**14.7 No Assignment of Payments**. Merchant will not assign to any third party any payments due Merchant under this Agreement. All indebtedness arising from charges will be for bona fide sales of goods or services (or both) at Merchant's establishments and free of liens, claims and encumbrances other than ordinary sales taxes. The prohibition on assigning payments due Merchant, however, does not apply to the sale of Transaction receivables to Chase Paymentech, its Affiliates or a partner of Chase Paymentech or its Affiliates that provides cash advance funding.

**14.8 Refund Policies**. Merchant acknowledges that its refund policies for purchases American Express Payments Cards must be at least as favorable as its refund policy for purchases made on Payment Cards of other Payment Brands.  Merchant agrees to disclose to holders of American Express Payment Cards the refund policy at the time of purchase and in accordance with Applicable Law.

**14.9 Collection for Cardholders**.  Merchant may not collect or attempt to collect from any holder of American Express Payment Cards for any purchase or payment on an American Express Payment Card unless: (A) the charge has been charged back to the Merchant; (B) Merchant has accepted/paid the charge (i.e., no Chargeback reversal has been processed); and (C) Merchant has a right to collect or attempt to collect funds to recover unpaid amounts lawfully owed to Merchant by such holder American Express Payment Cards.

Exhibit 1

**14.10 NOTICE REQUIRED BY AMERICAN EXPRESS:** **American Express requires that Chase Paymentech inform you that (i) American Express charges Chase Paymentech a** wholesale **discount rate and not interchange and (ii) American Express operates a non-interchange based network.**


**15. D**ISCLAIMER**; L**IMITATION OF **D**AMAGES**.** Subject to Section 5, Chase Paymentech will, at its own expense, correct any Transaction Data to the extent that such errors have been caused by Chase Paymentech or by malfunctions of Chase Paymentech's processing systems. However, Chase Paymentech shall not be liable or responsible for the authenticity, accuracy, corruption, damage to, tampering with, or failure to receive any Transaction Data transmitted in any form or format to Chase Paymentech by, or on behalf of, Merchant, and Chase Paymentech shall be entitled to rely on data it receives from, or on behalf of, Merchant in the discharge of its obligations hereunder.

<strong>PLEASE READ THIS PROVISION CAREFULLY</strong>

**UNDER NO CIRCUMSTANCES WILL CHASE PAYMENTECH'S LIABILITY ARISING OUT OF OR RELATED TO ITS PERFORMANCE OF SERVICES UNDER THIS AGREEMENT EXCEED THE TOTAL FEES PAID TO CHASE PAYMENTECH BY MERCHANT UNDER THIS AGREEMENT (NET OF PAYMENT BRAND FEES, THIRD PARTY FEES, INTERCHANGE, ASSESSMENTS, PENALTIES, AND FINES) FOR THE SIX (6) MONTHS PRIOR TO THE TIME THE LIABILITY AROSE.**

**IN NO EVENT WILL ANY PARTY, ITS RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, OR AFFILIATES, BE LIABLE FOR SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES, REGARDLESS OF THE FORM OR ACTION AND EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

**ANY FINES, FEES, PENALTIES, ASSESSMENTS OR OTHER AMOUNTS IMPOSED BY THE PAYMENT BRANDS SHALL BE DIRECT DAMAGES AND SHALL NOT BE DEEMED TO BE SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES.**

**ALL PARTIES ACKNOWLEDGE THAT THIS IS AN AGREEMENT FOR COMMERCIAL SERVICES. THE UNIFORM COMMERCIAL CODE DOES NOT APPLY AND CHASE PAYMENTECH AND MEMBER HEREBY DISCLAIM ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, MADE TO MERCHANT OR ANY OTHER PERSON, REGARDING QUALITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE (REGARDLESS OF ANY COURSE OF DEALING, CUSTOM, OR USAGE OF TRADE) OF ANY SERVICES PROVIDED UNDER THIS AGREEMENT OR ANY GOODS PROVIDED INCIDENTAL TO SUCH SERVICES.**


**16. M**ISCELLANEOUS**.**
**16.1 Taxes.** Unless Merchant is otherwise exempt, and, if applicable, provides a valid exemption certificate, Merchant agrees to pay any taxes imposed on the Services, equipment, supplies, and other property provided under this Agreement, and Merchant authorizes Chase Paymentech to increase the amount collected from Merchant to reflect any and all assessments or increases in the sales, use, occupational, property, lease, or other taxes imposed on such sale or lease of Services, tangible property, intellectual property, equipment, supplies, and other goods purchased.

**16.2 Section Headings.** The section headings of this Agreement are for convenience only and do not define, limit, or describe the scope or intent of this Agreement.

**16.3 Assignment; Other Events.**
(a) Merchant may not transfer or assign this Agreement without the prior written consent of Chase Paymentech. Any transfer or assignment of this Agreement by Merchant, by operation of law, merger, or otherwise, without Chase Paymentech's prior written consent is null and void, and Merchant is fully responsible with respect to all Transactions submitted by the purported assignee/transferee, and for any and all related liabilities, Chargebacks, expenses, costs, fines, fees or penalties arising from such Transactions. No assignee for the benefit of creditors, custodian, receiver, trustee in bankruptcy, debtor in possession, sheriff or any other officer of a court, or other person charged with taking custody of Merchant's assets or business, has any right to continue or to assume or to assign this Agreement.
(b) Merchant agrees to provide Chase Paymentech with not less than 30 days' prior written notice of:
  i. any sale of all or substantially all of the assets of Merchant; or
  ii. any person or entity becoming the beneficial owner, directly or indirectly, of securities representing more than fifty percent (50%) of the combined voting power of Merchant's securities, or otherwise acquires voting control of the Merchant.
(c) Upon notice to Merchant, another Payment Brand member may be substituted for Member under whose

Exhibit 1

DocuSign Envelope ID: 9AB5A87A-B733-4DB8-999D-5EF33C309B6F

sponsorship this Agreement is performed and from Chase Paymentech is acting as agent hereunder. Subject to Payment Brand Rules, Chase Paymentech may assign or transfer this Agreement and its rights and obligations hereunder and may delegate its duties hereunder, in whole or in part, to any third party, whether in connection with a change in sponsorship, as set forth in the preceding sentence, or otherwise, without notice to or consent of Merchant.

**16.4 Parties; Independent Contractor.** This Agreement is binding upon and inures to the benefit of the parties and their respective heirs, administrators, representatives, and permitted successors and assigns. Merchant agrees that it is responsible for its employees' actions. In providing Services to Merchant, Chase Paymentech will not be acting in the capacity of agent, partner, or joint venturer; Chase Paymentech is acting solely as an independent contractor.

**16.5 Representations.** Merchant agrees to perform its obligations under this Agreement in compliance with all applicable laws. Merchant represents and warrants that statements made on its Application are true as of the date of this Agreement. Merchant represents and warrants that its execution of and performance under this Agreement:

    (a) in no way breaches, contravenes, violates, or in any manner conflicts with any of its other legal obligations, including, without limitation, its corporate charter or similar document or any agreement between Merchant and any third party or any affiliated entity;

    (b) has been duly authorized by all necessary action and does not require any consent or other action by or in respect of any third party; and

    (c) that the person signing this Agreement on behalf of Merchant is an Authorized Representative.

**16.6 Publicity.** Each party agrees that any other party may publicly disclose, through press releases or otherwise, the existence of the business relationship that is the subject of this Agreement. Any such disclosure may identify the parties by name but must not, without the prior written consent of the non-disclosing party, include any of the terms of this Agreement.

**16.7 Severability.** Should any provision of this Agreement be determined to be invalid or unenforceable under any law, rule, or regulation, including any Payment Brand Rule, such determination will not affect the validity or enforceability of any other provision of this Agreement.

**16.8 Waivers.** No term or condition of this Agreement may be waived except pursuant to a written waiver executed by the party against whom such waiver is sought to be enforced.

**16.9 Entire Agreement.** The Payment Brand Rules, Application, Terms and Conditions, taxpayer identification and certification documentation, and all schedules, supplements, and attachments are made a part of this Agreement for all purposes. This Agreement represents the entire understanding between Merchant and Chase Paymentech with respect to the matters contained herein and supersedes any prior agreements between the parties. Merchant agrees that in entering into this Agreement it has not relied on any statement of Chase Paymentech or its representatives. This Agreement prevails over any conflicting terms of any agreement governing the Settlement Account.

**16.10 Notices.** Except as otherwise provided in this Agreement, all notices must be given in writing and either hand delivered, faxed, mailed first class, postage prepaid, sent via electronic mail transmission, or sent via overnight courier (and will be deemed to be given when so delivered or mailed) to Merchant's legal address set forth in the Application, to Chase Paymentech at: Attn: Legal Department, 14221 Dallas Parkway, Dallas, Texas 75254, or to such other address as either party may from time to time specify to the other party in writing. Notices provided in writing on Merchant's monthly statement(s) are sufficient for formal notice under the terms of this Section 16.10.

**16.11 Governing Law; Waiver of Right to Contest Jurisdiction; Waiver of Jury Trial; Arbitration.** This Agreement will be governed by and construed in accordance with the laws of the State of Texas without reference to conflict of law provisions. Any action, proceeding, arbitration hearing or mediation relating to or arising from this Agreement must be brought, held, or otherwise occur in Dallas County, Dallas, Texas.

---

**PLEASE READ THIS PROVISION CAREFULLY. IT PROVIDES THAT ANY CLAIM MAY BE RESOLVED BY BINDING ARBITRATION.**

**WITH BINDING ARBITRATION MERCHANT ACKNOWLEDGES AND AGREES THAT:**

    **(a) MERCHANT IS GIVING UP ITS RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY CLAIM ALLEGED AGAINST CHASE PAYMENTECH, MEMBER, OR RELATED THIRD PARTIES;**

    **(b) MERCHANT IS GIVING UP ITS RIGHT TO HAVE A COURT RESOLVE ANY CLAIM ALLEGED AGAINST CHASE PAYMENTECH, MEMBER, OR RELATED THIRD PARTIES; AND**

    **(c) MERCHANT IS GIVING UP ITS RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND TO PARTICIPATE AS A MEMBER OF A**

Exhibit 1

CLASS OF CLAIMANTS, IN ANY LAWSUIT OR ARBITRATION FILED AGAINST CHASE PAYMENTECH, MEMBER, AND RELATED THIRD PARTIES.

IN THE ABSENCE OF THIS ARBITRATION AGREEMENT, MERCHANT AND CHASE PAYMENTECH MAY OTHERWISE HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH A COURT BEFORE A JUDGE OR A JURY AND TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS (INCLUDING CLASS ACTIONS). BUT, EXCEPT AS OTHERWISE PROVIDED ABOVE, THOSE RIGHTS, INCLUDING ANY RIGHT TO A JURY TRIAL, ARE WAIVED AND ALL CLAIMS MUST NOW BE RESOLVED THROUGH ARBITRATION.

Any claim, dispute, or controversy ("Claim") by either Merchant, Chase Paymentech or Member against the other, or against the officers, directors, employees, agents, parents, subsidiaries, affiliates, beneficiaries, agents, successors, or assigns of the other, arising from or relating in any way to this Agreement or to the relationship formed between the parties as a result of this Agreement, including Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved exclusively and finally by binding arbitration administered by the American Arbitration Association ("AAA"). All Claims are subject to arbitration, no matter what theory they are based on. This includes Claims based on contract, tort (including intentional tort), fraud, agency, Merchant, Chase Paymentech's or Member's negligence, statutory or regulatory provisions, or any other source of law. Claims and remedies sought as part of a class action, private attorney general, or other representative action are subject to arbitration on an individual (non-class, non-representative) basis only, and the arbitrator may award relief only on an individual (non-class, non-representative) basis. Merchant and Chase Paymentech will agree on another arbitration forum if the AAA ceases operations. The arbitration will be conducted before a single arbitrator and will be limited solely to the Claim between Merchant and Chase Paymentech and/or Member. The arbitration, or any portion of it, will not be consolidated with any other arbitration and will not be conducted on a class-wide or class action basis. The prohibition against class action contained in this Section shall be non-severable from the remainder of this Section. If either party prevails in the arbitration of any Claim against the other, the non-prevailing party will reimburse the prevailing party for any fees it paid to the AAA in connection with the arbitration, as well as for any reasonable attorneys' fees incurred by the prevailing party in connection with such arbitration. Any decision rendered in such arbitration proceedings will be final and binding on the parties, and judgment may be entered in a court of competent jurisdiction. Rules and forms of the AAA may be obtained and Claims may be filed at any AAA office, www.adr.org, or 335 Madison Avenue, New York, NY 10017, telephone 1-800-778-7879. Any arbitration hearing at which Merchant appears will take place at a location within Dallas County, Dallas, Texas. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16. This arbitration agreement applies to all Claims now in existence or that may arise in the future. Nothing in this Agreement shall be construed to prevent any party's use of (or advancement of any Claims, defenses, or offsets in) bankruptcy or repossession, replevin, judicial foreclosure, or any other prejudgment or provisional remedy relating to any collateral, security, or other property interests for contractual debts now or hereafter owned by either party to the other.

**16.12 Force Majeure.** Neither party will be liable for delays in processing or other nonperformance caused by such events as fires, telecommunications failures, utility failures, power failures, equipment failures, labor strife, riots, war, terrorist attack, nonperformance of Chase Paymentech's vendors or suppliers, acts of God, or other causes over which the respective party has no reasonable control, except that nothing in this Section 16.12 will affect or excuse Merchant's liabilities and obligations for Chargebacks, refunds, or unfulfilled goods and services.

**16.13 Amendment.** Except as otherwise set forth in this Agreement, the Agreement may be amended at any time by Chase Paymentech upon thirty (30) days' notice to Merchant. Notwithstanding the foregoing, in the event the terms of this Agreement must be amended pursuant to a change required by the Payment Brand Rules or any third party with jurisdiction over the matters described herein, such amendment will be effective immediately. Merchant's electronic signature or continued submission of Transactions to Chase Paymentech following such notice will be deemed to be Merchant's acceptance of such amendment.

**16.14 Counterparts; Electronic Signatures under the Uniform Electronic Transactions Act.** This Agreement may be executed in several counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Electronic Signatures, as defined by the Uniform Electronic Transactions Act, retain all the legal effect and enforceability of an original signature.

**16.15 Merchant Taxpayer Certification and Chase Paymentech Reporting Obligations.** In accordance with certain tax rules and regulations, Chase Paymentech is obligated to collect and report certain taxpayer information to the United States Internal Revenue Service. Therefore, in conjunction with the execution of this Agreement, Merchant shall provide Chase Paymentech with the appropriate taxpayer certification documentation, via Internal Revenue Service (IRS) Form W-9 (or the appropriate versions of Form W-8, if applicable). Merchant shall promptly notify Chase Paymentech if there are any changes in this information. Chase Paymentech may deduct withholding taxes, if any, from proceeds payable to Merchant or any entity that is a party to this agreement where required under applicable law.

Exhibit 1

Chase Paymentech may, in accordance with applicable law and from time to time during the term of this Agreement, request Merchant to recertify its taxpayer certification hereunder. Furthermore, Merchant shall be responsible for any penalties related to the reporting obligations of Chase Paymentech hereunder to the extent such penalties accrue based on the actions or inactions of Merchant despite reasonable notice from Chase Paymentech.

**16.16 Member Obligations.** While the Payment Brand Rules impose certain obligations on Member (the "Member Obligations"), Paymentech has the authority to perform the Member Obligations on behalf of Member, and, unless otherwise specifically set forth in the Agreement, Paymentech shall be solely responsible for performance of the Member Obligations under the terms of this Agreement.

**17. SURVIVAL.** The following Sections survive termination of this Agreement: 4.2, 4.4, 4.5, 4.6, 5, 6, 7, 9, 10.2, 10.3, 10.4, 10.5, 11, 12, 14, 15, 16, 17, 18 and Personal Guaranty.

**18. TERMS USED IN THE APPLICATION AND THESE TERMS AND CONDITIONS.**

| | |
|---|---|
| **Application** | a statement of Merchant's financial condition, a description of the characteristics of Merchant's business or organization, and related information Merchant or its Authorized Representative(s), has previously or concurrently submitted to Chase Paymentech, including credit, financial, and other business related information, to induce Chase Paymentech to enter into this Agreement with Merchant and that has induced Chase Paymentech to process Merchant's Transactions under the terms and conditions herein |
| **Authorized Representative** | an owner, partner, officer, or other agent of the Merchant that is duly authorized to enter into agreements on behalf of Merchant and to legally bind Merchant to such agreements |
| **Chargeback** | a reversal of a Transaction Merchant previously presented to Chase Paymentech pursuant to Payment Brand Rules |
| **Chase** | JPMorgan Chase Bank, N.A. or, where applicable based on the Chase Account type, Chase Bank U.S.A., N.A. |
| **Chase Account** | a line of credit issued by Chase or its affiliates, a prepaid account issued or associated with Chase, or a deposit account maintained by Chase, in each case, which may but need not, be associated with a Chase-issued debit or credit card |
| **Chase Customer** | the person to whom or entity to which a Chase Account is issued or who is otherwise authorized to use a Chase Account |
| **ChaseNet** | Chase's proprietary closed-loop payment processing platform(s) where Transactions involving Eligible Chase Accounts, are processed directly between Merchant and Chase and not through the traditional Payment Brand "interchange" system |
| **ChaseNet Transaction** | a Transaction, utilizing an Eligible Chase Account and which is processed directly between Merchant and Chase over the ChaseNet platform |
| **Chase Paymentech or Paymentech** | Paymentech, LLC, a Delaware limited liability company, having its principal office at 14221 Dallas Parkway, Dallas, Texas 75254 |
| **Chase Requirements** | the Chase Merchant Services Program Requirements governing ChaseNet Transactions, as may be amended from time to time, provided to or made available to Merchant |
| **Conveyed Transaction** | any Transaction conveyed to a Payment Brand for settlement by such Payment Brand directly to Merchant |
| **Customer** | the person or entity to whom a Payment Instrument is issued or who is otherwise authorized to use a Payment Instrument, including a Chase Customer |
| **Data Compromise Event** | An occurrence that results, or could result, directly or indirectly, in the unauthorized access to or disclosure of Transaction Data or Payment Instrument Information |
| **Effective Date** | The day this Agreement is accepted and agreed to by Chase Paymentech, as set forth in Section 10.1 |
| **EMV** | Europay, MasterCard and Visa |
| **High CV Merchant** | A Merchant with greater than $1,000,000 in Charge Volume in a rolling 12 month period |
| **Merchant** | The legal entity identified in the Application and whose name and signature appears on this Agreement |

Exhibit 1

| **Member** | JPMorgan Chase Bank, N.A. or other entity providing sponsorship to Chase Paymentech as required by all applicable Payment Brands.  Member is a principal party to this Agreement and Merchant's acceptance of Payment Brand products is extended by the Member |
|---|---|
| **Payment Application** | a third party application used by merchant that is involved in the authorization or settlement of Transaction Data |
| **Payment Brand** | Any payment method provider whose payment method is accepted by Chase Paymentech for processing, including:<br>• Visa Inc.;<br>• MasterCard International, Inc.;<br>• Discover Financial Services, LLC;<br>• American Express Travel Related Services Company, Inc.; and<br>• any other credit and debit card providers, debit network providers, gift card, and other stored value and loyalty program providers.<br>Payment Brand also includes the Payment Card Industry Security Standards Council and the Electronic Payment Association (frequently referred to as "NACHA") |
| **Payment Brand Rules** | All bylaws, rules, programs, regulations, specifications, and manuals, as they exist from time to time, of the Payment Brands, and, to the extent applicable, the Chase Requirements |
| **Payment Instrument or Payment Card** | An account, or evidence of an account, authorized and established between a Customer and a Payment Brand, or representatives or members of a Payment Brand that Merchant accepts from Customers as payment for a good or service, including a Chase Card<br>Payment Instruments include, credit and debit cards, stored value cards, loyalty cards, electronic gift cards, authorized account or access numbers, paper certificates, and credit accounts.  Use of the term Payment Instrument or Payment Card throughout this Agreement includes any Payment Card with an embedded microcomputer EMV chip. |
| **Payment Card Information or Payment Instrument Information** | Information related to a Customer or the Customer's Payment Card that is obtained by Merchant from the Customer's Payment Card, or from the Customer in connection with his or her use of a Payment Card).  Such information may include, but is not limited to:<br>• the Payment Card account number and expiration date;<br>• the Customer's name or date of birth;<br>• PIN data, security code data (such as CVV2 and CVC2); and<br>• and any data read, scanned, imprinted, or otherwise obtained from the Payment Instrument, whether printed thereon, or magnetically, electronically, or otherwise stored thereon.<br>For the avoidance of doubt, the data elements that constitute Payment Card Information are treated according to their corresponding meanings as "cardholder data" and "sensitive authentication data" as such terms are used in the then current PCI DSS. |
| **Refund** | Any refund or credit issued for any reason, including, without limitation, for a return of merchandise or cancellation of services and any adjustment of a Transaction |
| **Refund Policy** | A written policy with regard to Refunds |
| **Retrieval Request** | A request for information by a Customer or Payment Brand relating to a claim or complaint concerning a Transaction |
| **Security Standards** | All rules, regulations, standards, or guidelines adopted or required by the Payment Brands or the Payment Card Industry Security Standards Council relating to privacy, data security, and the safeguarding, disclosure, and handling of Payment Instrument Information, including, without limitation, the Payment Card Industry Data Security Standards ("PCI DSS"), Visa's Cardholder Information Security Program ("CISP"), Discover's Information Security & Compliance Program ("DISC"), American Express's Data Security Operating Requirements, MasterCard's Site Data Protection Program ("SDP"), Visa's Payment Application Best Practices ("PABP"), the Payment Card Industry's Payment Application Data Security Standard ("PA DSS"), MasterCard's POS Terminal Security program, and the Payment Card Industry PIN Transmission Security program (PCI PTS), in each case as they may be amended from time to time |
| **Services** | All Transaction processing services provided by Chase Paymentech, including, without limitation, authorization, conveyance, settlement, and funding of all Transactions, as provided for in this Agreement or any subsequent agreement between the parties.  The Services may also include the provision of or access to monthly statements or reporting tools, as well as assistance with Merchant's Chargebacks. |

Exhibit 1

| Service Provider | Any party that processes, stores, receives, transmits, or has access to Payment Instrument Information on Merchant's behalf, including, without limitation, its agents, business partners, contractors, and subcontractors |
|---|---|
| Settled Transaction | A Transaction conducted between a Customer and Merchant utilizing a Payment Instrument in which consideration is exchanged between the Customer and Merchant for the purchase of a good or service or the Refund of such purchase and the value for such Transaction is settled by the Payment Brand through Chase Paymentech to the Merchant |
| Stored Value Card Transaction | A Transaction in which a Customer adds or redeems value to or from a stored value card, gift card, or loyalty Payment Card issued by or on behalf of Merchant |
| Transaction | A transaction conducted between a Customer and Merchant utilizing a Payment Instrument in which consideration is exchanged between the Customer and Merchant |
| Transaction Data | The written or electronic record of a Transaction, including, without limitation, an authorization code or settlement record, which is submitted to Chase Paymentech |
| Transaction Receipt | An electronic or paper record of a Transaction generated upon completion of a sale or Refund, a copy of which is presented to the Customer |

**Personal Guaranty**.  Each Guarantor whose name and signature appears in the Application (individually a "Guarantor" and collectively the "Guarantors") hereby, jointly and severally, unconditionally and irrevocably, guarantee the full, timely and continuing performance of each and every representation, warranty, covenant, agreement and obligation of Merchant now or hereafter arising under or in connection with the Agreement, including, without limitation, any indebtedness and other liabilities of Merchant created, at any time, under or in connection with the Agreement (the "Guaranteed Obligations").  Each Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of Merchant and is familiar with the value of any and all collateral intended to be created as security for the payment of the Guaranteed Obligations. However, no Guarantor is relying on such financial condition or collateral, including, without limitation, the existence of a Reserve Account (if any) as an inducement to enter into this Personal Guaranty. Each Guarantor hereby unconditionally and irrevocably waives any and all notices, demands and other formalities, of every kind and description, including, without limitation, any (i) notice of acceptance of this Personal Guaranty, (ii) notice of the incurrence of any Guaranteed Obligation, (iii) notice of the occurrence of any breach or default relating to or in connection with the Agreement or (iv) demand for performance or payment, presentment, protest, notice of protest or proof of breach or default.  This is an unconditional, irrevocable and continuing guaranty of payment and not a guaranty of collection.  Each Guarantor hereby acknowledges and agrees that such Guarantor is liable for the Guaranteed Obligations as primary obligor and Chase Paymentech, Member or any other beneficiary of the Agreement, as the case may be, may exercise their respective rights and remedies hereunder against one or more Guarantors, whether or not first or ever exercising their respective rights and remedies hereunder or otherwise against Merchant or any other guarantor or obligor or enforcing or collecting any present or future collateral securing the Guaranteed Obligations.  Each Guarantor hereby acknowledges and agrees that such Guarantor's obligations and liabilities pursuant to this Personal Guaranty shall in no way be discharged, released or in any way affected by (i) any action taken under or in connection with the Agreement or the Guaranteed Obligations, including, without limitation, any assignment, renewal, extension, compromise, indulgence, forbearance, waiver, acceleration, modification, amendment or other change granted to Merchant or any guarantor or obligor or otherwise related thereto, (ii) the taking, holding, exchange, enforcement, waiver or release of any security for the performance of the Guaranteed Obligations or this Personal Guaranty, (iii) the release, in whole or in part, of Merchant or any other guarantor or obligor from any obligation or liability, (iv) the substitution of any one or more of the Guarantors or the acquisition of additional guarantors, (v) any insolvency, bankruptcy or similar proceedings involving or affecting Merchant or any other guarantor or obligor, (vi) the death, dissolution or ceasing to exist (whether voluntary or involuntary) of Merchant or any other guarantor or obligor or (vii) any other act, omission or circumstance whatsoever that may in any manner vary the risks of such Guarantor or might otherwise constitute a legal or equitable defense or discharge of such Guarantor or any other guarantor or obligor.  Each Guarantor hereby waives all defenses based on occurrences of the types described in clauses (i) through (vii) above. Each Guarantor hereby represents and warrants that such Guarantor has received, or will receive, direct or indirect benefit from the making of this Personal Guaranty and that the Guaranteed Obligations and such benefit has a value reasonably equivalent to or greater than the obligations and liabilities incurred pursuant to this Personal Guaranty.  This Personal Guaranty shall be binding on each Guarantor and such Guarantor's heirs, administrators, legal representatives, successors and assigns, and shall inure to the benefit of Chase Paymentech, Member and any other beneficiary of the Agreement, as the case may be, and their respective heirs, administrators, legal representatives, successors, and assigns. Neither Guarantor may, without the prior written consent of Chase Paymentech, assign any of its rights, powers, duties, or obligations hereunder. The Guarantors jointly and severally agree to pay reasonable attorneys' fees and all other costs and expenses which may be incurred by Chase Paymentech in the enforcement of this Personal Guaranty.

Exhibit 1

Exhibit 1